RICHARD AMES

*v.*

RICHARD T. WITBECK, Trustee.

*Opinion filed April 17, 1899—Rehearing denied June 7, 1899.*

1. SPECIFIC PERFORMANCE—*when promisor is estopped to deny full performance.* Where changes are made in the original contract by mutual consent of both parties, and the contract, as so modified, is completed by the promisee, the promisor is estopped to set up such changes as showing failure by the promisee to perform the original contract, in order to bar relief under the latter's bill for specific performance.

2. SAME—*when contract relating to personal property may be enforced in equity.* A contract by a corporation to transfer certain of its bonds and stock to the promisee in consideration of his undertakings may be specifically enforced in equity, where the corporation is insolvent and the bonds and stock have no market value, such value being dependent upon questions relating to the title to real estate, of which the corporation had been fraudulently divested, which could be determined only by a court of equity.

3. SAME—*when fraudulent conveyances may be set aside to make specific performance effective.* One entitled to specific enforcement of a contract by a corporation to transfer certain bonds and stocks, may, in order to make the relief effective, the corporation being insolvent, have certain conveyances and encumbrances between the parties to the suit, by which the corporation had been deprived of its property, set aside upon proof that such conveyances and encumbrances were fraudulent.

4. TRUSTS—*trustee cannot be permitted to deal with subject matter for his own benefit.* A trustee for creditors who has filed a bill to enforce specific performance of the debtor's contract and to set aside certain notes and a deed of trust as fraudulent upon the rights of such debtor, cannot be permitted to purchase such notes and deed of trust and acquire title to the property for himself.

5. EQUITY—*good faith is essential to right to re-imbursement for improvements.* Upon the setting aside of certain conveyances and encumbrances the complainant should not be required, as a condition of relief, to re-imburse the party divested of title for the enhanced value of the property from improvements made by him while claiming title, where it appears that he was guilty of intentional fraud in acquiring such title. .

6. SAME—*equity will not permit enforcement of penalty by decree.* The fact that one has been guilty of fraud in acquiring title to certain lots, upon which a building is located, does not authorize a court

of equity, upon divesting him of title to such lots and re-vesting it in the original owners, to include in the decree an adjacent lot purchased by him from third parties for use in connection with the building, and provide for the divesting of his title thereto and the vesting thereof in the owners of the other lots upon payment of the price paid for the same.

7. MORTGAGES—*effect of release of mortgage after conveyance to several grantees.* Where a mortgagee has knowledge that two or more parcels of land covered by his mortgage have been conveyed to different subsequent purchasers by the mortgagor, he cannot release one parcel without also thereby releasing the others *pro tanto* or altogether, according to the circumstances of the case.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

GEORGE W. WALL, and W. W. ROSS, for appellant.

C. VANALEN SMITH, and JAMES A. FULLENWIDER, for appellee.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This is an appeal from a decree rendered in the circuit court of Cook county, holding that a certain contract be specifically performed and that certain conveyances of real estate be set aside, and awarding other relief. The record is voluminous and the facts complicated, but they are in substance as follows:

On June 22, 1891, Sidney Briggs, as the owner in fee of lots 1 and 2 of the county clerk's subdivision of certain other lots in Ellis' east addition to the city of Chicago, leased the same to one Cozzens for a term of ninety-nine years, and in August, 1892, said Cozzens sub-let the premises for the remainder of the term to S. S. Putnam, Jr., who thereupon began to erect upon the premises a large apartment building. The following is substantially a correct plat of the property mentioned. The ten-foot alley shown on the plat was reserved in the lease, and the building in question was called the "Vincennes

Building," and covered all that part of lots 1 and 2 that lies west of the alley:

After incurring obligations to contractors and material-men upwards of $55,000 in amount, Putnam failed, and in April, 1893, assigned his lease to John M. Gartside, an attorney, for the benefit of those to whom he had become indebted in constructing the building. In February preceding, the Claremont Company had been incorporated under the laws of this State to operate an apartment building and hotel, with a capital stock of $100,000, divided into 1000 shares, which capital stock was soon after increased to $150,000, and Edward F. Parr claimed to be the owner of a majority of such stock, though nothing had been paid for such stock and no shares had been issued to him, but later a few shares were issued to those, including Parr, who became its directors and officers. Those to whom Putnam had become indebted for work

and materials furnished for the erection of the building, and who will be called for convenience the "Putnam creditors," entered into negotiations with Parr, who appeared to be in control of the Claremont Company, to finish the building and to cause the ownership thereof and of the leasehold to be transferred to said company. The result of these negotiations was, that on or about April 29, 1893, it was agreed between the Claremont Company, Parr and the Putnam creditors that the leasehold should be transferred to the company and that it should become the owner of the building; that the Putnam creditors should take in payment of their demands $50,000 in preferred stock (though it does not appear that the company had any authority to issue preferred stock) and the rest in common stock of the company, and that Parr should complete the building at his own expense, free from all claims, liens and demands whatsoever, except that the company should issue its bonds to him to the amount of $50,000, payable in twenty years, secured by its mortgage on the premises, and should give him its note for $8400, payable in six months, secured by a pledge of eighty-four shares of its capital stock, and should also issue to him paid-up and non-assessable shares of its capital stock to the amount of $83,580.  The company, by resolution of its directors entered upon its records, authorized the issue, forthwith, of the bonds, note and stock as agreed upon, and the Putnam creditors received and accepted, respectively, the shares contracted for, according to their respective demands, but the bonds, note and stock were not issued to Parr.  Certain of the Putnam creditors became directors of the company with Parr, and Parr became its president.  Parr had agreed to complete the building at his own expense, free from all liens and demands, and although the order adopted authorized the issue of such bonds forthwith, he did not then ask for them or take any action indicating that he considered he was entitled to them before he had com-

plied with his contract, and we are unable to find in the record sufficient evidence to sustain the finding of the court below in its decree that "it was known to the Claremont Company that Parr expected to and did rely largely upon moneys to be raised by the sale of said $50,000 of bonds for means wherewith to finish the said partly erected building on the leasehold property." On the contrary, the preponderance of the evidence is that Parr represented that he had sufficient means to carry out his part of the contract. The contracts which he entered into with various parties for work and materials to complete the building were in some instances in his own name, but many of them were entered into by him as president of the company. It does not appear that he had any means whatever with which to pay for such work and materials. Being unable to pay for the same, efforts were made by him, and many others interested in the company and in the property, to obtain loans to be secured by mortgage on the property of the company, but the panic of 1893 had set in and loans were not easily obtained. It was, however, concluded by all parties in interest that such loans might be procured if the company could procure title to the property in fee simple. Accordingly it was agreed that Parr should purchase for the company, and he did so purchase from Briggs, the original lessor, the fee title for $50,000 and took the conveyance to himself. He thereupon borrowed $35,000 of Lehman, for which he gave his note, payable in one year, secured by his deed of trust upon the west 84.6 feet of said lots 1 and 2, designated on the plat as the "west parcel." Of this borrowed money he paid $20,000 to Briggs as part of the purchase money, and paid all but a small portion of the remaining $15,000 upon demands which had accrued against him for work and materials furnished upon the building. For the remainder of the purchase money due Briggs he gave his note for $20,000, secured by a second trust deed on the said "west parcel," and his

note for $10,000, secured by a trust deed on the north 58.5 feet of the east 84.6 feet of said lot 1, or said "east parcel," and then, about the same time, July 18, 1893, conveyed the property, by deed of general warranty, to the Claremont Company, subject to said three trust deeds securing the said $65,000. As a part of the negotiations resulting in these encumbrances many of the creditors waived their mechanics' liens on the building and took the notes of the company for their demands to the amount of $22,000; others filed mechanics' liens, some of which are still pending.

Many efforts were made by Parr and others interested in the property and the company to obtain a larger loan with which to pay the debts of the company and of Parr, but they were unsuccessful, and Parr having incurred obligations under his contract to complete the building, estimated in the record at various amounts from $50,000 to $100,000, which he was unable to meet, on February 19, 1894, by his writing assigned all his rights and claims against the Claremont Company to Michael J. Roughan in trust, to realize on and settle the same, and to pay therewith, *pro rata*, the claims cf his creditors who had furnished labor and materials in the completion of the Vincennes building. Roughan had furnished labor and materials in plumbing for the building, and was one of Parr's creditors to the amount of about $6000. It was below, and is here, a controverted question whether or not Parr completed the building as he agreed to do, and while the evidence shows that afterward several thousand dollars were expended upon it, we are of the opinion that the building was substantially completed by Parr in the fall of 1893, and that the finding of the court below that it was completed by him is sustained by the evidence. It is, however, very clear that he did not comply with the terms of his contract as originally made, to complete it at his own expense, free from all liens and demands whatsoever, but, on the contrary, besides leaving

the company indebted on said notes aggregating $22,000, given for debts which he had contracted to pay, he left its building subject to mechanics' liens and to at least $15,000 of the Lehman encumbrance of $35,000, which $15,000, as before stated, was mostly used by him in the completion of the building. Whether or not the company waived compliance with the contract in the respects mentioned, and estopped itself from insisting that Parr did not perform the original contract, will be considered after a further statement of the case.

The board of directors was controlled by the Putnam creditors who had taken shares of stock for their demands, and they contended that Parr had not complied with his contract and that he should resign his position as president of the company. At a meeting of the directors on November 15, 1893, Parr resigned, and Kimball, one of the Putnam creditors, was elected president in his stead. The evidence shows there were many meetings of the Parr creditors and of the Putnam creditors, and many efforts made to come to some agreement respecting the property and their several claims. The Putnam creditors offered to unite with the Parr creditors upon some plan of action for the equal benefit of both sets of creditors, and to share *pro rata* with them in whatever could be obtained in satisfaction of their respective demands, and this offer being refused, then offered to either give or take ten per cent of their respective claims in full therefor. This offer was also refused. At this time a number of the Parr creditors who had not waived their mechanics' liens had filed liens against the property, and it is clear from the evidence that the Claremont Company was in an insolvent condition. It had no capital. It had received nothing for its capital stock except as above mentioned. Besides these liens of the Parr creditors it was indebted to others of such creditors who had waived their liens, upon its notes to them aggregating $22,000, which it could not pay, and its property was encumbered

for the $65,000 before mentioned, and the accrued interest thereon, and for taxes. In this condition of things the Putnam creditors who were in control of the corporation, either acting upon the conclusion which they had reached that Parr had not kept and performed his agreement in pursuance of which they had surrendered their claims and accepted therefor certificates of stock of the company, and deeming their stock, under the circumstances, to be of little or no value, or else, as the trial court found, acting fraudulently, at a meeting of the directors held January 20, 1894, surrendered their said shares to the company and took the notes of the company to the amount, in the aggregate, of $79,383.72, that being the amount which they determined was due them, and secured the same by a deed of trust of the company on its property to one Barnes, as trustee. The evidence is conflicting as to whether or not Parr, who was still a director, objected to this arrangement and demanded the fulfillment of his contract on the part of the company. The evidence tends strongly to prove that he asked to be let into this adjustment, insisting that he was entitled to something for his time and labor, but that his request was refused on the ground that he had failed to perform his contract and had thereby injured the company and its creditors. The trial court, however, who heard and saw the witnesses, found that Parr did not consent to or acquiesce in this action of the directors, but that he insisted upon his contract with the company and demanded that the bonds, note and stock be issued to him,—and we are not prepared to say that such finding is against the evidence. Doubtless, both positions are in part, and neither wholly, true.

There were controversies between the different sets of creditors and with Parr, and these controversies between creditors continued nearly a year, until the Putnam creditors sold their claims evidenced by the promissory notes of the company, secured by the Barnes deed of trust to Roughan, early in 1895. Roughan had filed his

bill in this case, as trustee, on April 13, 1894, and he testified that before he made his purchase of the Putnam creditors he called a meeting of the Parr creditors in December of 1894 or January of 1895; that at that time the Claremont property was in the hands of a receiver appointed in a suit to foreclose the Lehman mortgage, and that he advised the creditors to join and furnish sufficient money to buy out the Claremont Company and to take the property out of the hands of the receiver, but that they refused and wanted him to crowd and push the bill he had filed; that he replied that he had spent considerable money and would not spend any more in pushing that suit, and that if they would not do anything in the matter he would buy the property for himself. The evidence clearly shows that Roughan, notwithstanding the position he occupied as trustee for Parr and his creditors and as complainant in the bill to enforce Parr's contract, conceived the idea of acquiring the property of the company for himself while he was still trustee under the assignment from Parr, and from this time forward undertook to accomplish that object. He consulted with the Putnam creditors, the officers of the company and with Gartside, its attorney, who had a claim of $3000 against the company for services, and the result was that he agreed to pay Gartside's fee and to give the Putnam creditors $5000 for their notes against the company, aggregating $79,383.72, secured by the Barnes deed of trust. Roughan was without money with which to make the payment or to take up the encumbrances on the property, and in January or February, 1895, he applied to the Pacific Loan and Homestead Association for a loan upon the property.

On January 18, 1895, the Claremont Company, in pursuance of a resolution of its directors, conveyed the premises in controversy to Willette B. Robinson for no other consideration than the note of said Robinson to the company for $10,000. Robinson was a janitor at the Vincennes

building, was a relative of B. G. Robinson, who was the owner of the largest of the claims of the Putnam creditors, and was without means with which to pay such a note. The note was never paid but was eventually returned to the maker. A month later Robinson conveyed the property for the purported consideration of $110,000, but without any actual consideration whatever, to one Messenger, an employee of Roughan, and no other conclusion can reasonably be drawn from the evidence than that the conveyance of the property to Robinson was made for the purpose of defeating Parr and his creditors in the collection of their demands and of ultimately vesting the title in Roughan, for, while he denied that he had anything to do with that transaction, he testified that he agreed to give his note to B. G. Robinson for $2600 on account of it, and no other reason for that conveyance was disclosed by the evidence.

The Pacific Loan and Homestead Association had promised Roughan to make a loan on the property, and Roughan caused Messenger to make his written application therefor, as the owner of the property. Gartside had become the attorney of Roughan, and aided him in procuring title to the property and in procuring the loan from the association, and was to receive the $3000 claimed to be due him from the Claremont Company out of this loan. The papers were dated February 19, but the association declined to make the loan on the first of March, —the time agreed upon,—because of some objection to the title, but Roughan insisted that he must have $8000 without delay with which to pay the $5000 to the Putnam creditors and the $3000 to Gartside, and Wilson Ames, the appellant, who was a director in the association and was present at the time, agreed to advance the required $8000, and thereupon gave to the secretary of the association his check for that amount. The check was retained temporarily, but the secretary checked on his own funds to Roughan, and the amount was afterward in-

cluded in the loan of the association and Ames' check was returned to him, but the evidence tends to show that he received $1000 for the accommodation he extended. The association, however, would not make the loan until the bill in this case, filed the year before by Roughan, had been dismissed, and it required also, as a condition of making the loan, that the title to the property should be vested in Wilson Ames, one of its directors, in order, as it was stated, to avoid the necessity of foreclosure. Roughan, and Gartside, his attorney, procured an order of court dismissing the bill on March 9, and the loan was then made, the deed of trust securing the same having been executed by Messenger and the equity of redemption conveyed to the appellant. This deed of trust and the deed to Ames embraced the west 84.6 feet on which was situated the Vincennes building, and the deed of trust purported to secure a loan of $113,000, though the full amount was never advanced or paid by the association. After the dismissal of Roughan's bill of complaint, however, it did advance and pay, as part of the loan, upwards of $65,000 to take up the Lehman note of $35,000 and the Briggs note of $20,000 and the deeds of trust securing the same, with accrued interest, solicitors' fees and taxes, which notes and deeds of trust were transferred to the association but were not canceled or released. Four days after the bill had been dismissed, and on March 13, the solicitor for the Parr creditors caused Roughan's bill to be re-instated, and obtained an order of court restraining Roughan and Ames from disposing of the property, and a rule on Roughan to show cause why he should not be removed as trustee. At this time the title, subject to encumbrances, as to the west part of the premises, on which was situated the building, was in Wilson Ames, and the "east parcel," or the north 58.5 feet of the east 84.6 feet, was in Roughan, Messenger having so conveyed to them, respectively, in the month of February preceding.

On the second day of May the court made an order removing Roughan as trustee and appointing Isaac Tomlinson as his successor, and also modifying the order of March 13 so far as it restrained Wilson Ames and so far as it restrained any disposal of the west 84.6 feet, or the part on which the Vincennes building was situated, but continued in force, until the further order of the court, the restraining order against Roughan as to the rest, or east part, of the lots, etc.   This part was then vacant land.   The creditors of Parr, or some of them, were also ordered to execute and deliver to Roughan a bond of $1000, to be approved by the clerk, for the payment of all damages, etc., which might be caused by the issuing of and continuing in force the restraining order as to Roughan.   On June 18, 1895, no bond having been given, the court entered an order that the restraining order be vacated, set aside and for naught esteemed unless said bond should be delivered on or before the hour of ten o'clock in the forenoon of June 21, 1895.   No bond was delivered or presented within the time limited, and Roughan, as the evidence tends to prove, on said 21st of June, after the hour of ten o'clock, by a deed then delivered, conveyed said east part of the lots in controversy to Ames, the appellant.   A sufficient bond was, however, tendered after such conveyance and in the afternoon of said 21st of June, and on June 24 the court entered an order approving the bond and discharging the rule.   The court below, in its final decree, found that Roughan delivered this deed to Ames and that the deed was recorded on the 18th day of June, while the restraining order was in force, but we are unable to find any evidence in the record to sustain this finding.

The association advanced or paid out on said loan of $113,000 only about $81,000, the precise amount not being clearly shown, but the loan having been reduced, by agreement, to that amount.   But before the title to the "east parcel" of the lot was vested in Ames, the associa-

tion had agreed with Roughan to make a second loan of $65,000 on the entire property, provided the title should thereupon be conveyed to Ames. Accordingly, the title having first been vested in Messenger, he executed his second bond to the association, secured by a deed of trust on the whole of the premises, after which, as agreed, the title was conveyed to Ames, where it remained until divested by the final decree, from which Ames has prosecuted this appeal. A third deed of trust, to secure a loan of $20,000 by the association, was also executed to its attorney, Martin, as trustee, but no money was advanced under it and it was set aside by the decree.

By lease dated March 1, 1895, the Vincennes building was leased by Ames to Roughan for a rental, in monthly payments, equal to the monthly dues accruing to the loan association provided in the two bonds and deeds of trust given for the two loans. Roughan went into possession of the premises about March 1, 1895. He and Ames soon determined that the Vincennes building would not yield an income sufficient to pay expenses and the fixed charges against it, and that it would be advisable to build an annex upon that part of the lots east of the alley, to be connected above and below the alley with the principal building; that the two buildings could be heated, lighted and managed at a cost not greatly exceeding that incurred in the use of the Vincennes building alone. With moneys obtained from the second loan and upwards of $50,000 advanced by Ames, Roughan constructed and finished the annex at a cost of upwards of $70,000, and also made improvements upon the Vincennes building and ground, in sinking an artesian well, putting in an electric light plant, remodeling the dining room, and making other valuable improvements, at a cost approximating $15,000. This vacant part of the lots upon which the annex was built was encumbered by the deed of trust securing a note for purchase money held by Briggs, upon which there was unpaid interest, which

note and deed of trust were taken up with moneys furnished in the way above mentioned by the association. The evidence shows that this piece was worth but little more than the amount of this encumbrance. The association did not advance or pay out on the second loan exceeding $50,000.

Roughan testified that he was entitled to a large credit upon these loans of the association for plumbing work and materials furnished for some houses which Butts, the secretary of the association, had built and turned over to the association to meet deficits in his accounts, but it became necessary, from the view taken of the case by the court below, to ascertain the precise amount due the association, for it was there adjudged that Ames, as well as Roughan, was a trustee *de son tort*, and was entitled to nothing for the improvements which they had made upon the property or for the moneys so advanced by Ames and so expended, and it was by stipulation between the complainant in the bill and the loan association agreed that all the claims of the latter should be compromised and settled at $90,000, and that said first deed of trust should be a valid lien for $65,000 and the second for the balance of said $90,000,—that is, for $25,000,—but without prejudice to the right of the association or its receiver (for it, too, had passed into the hands of a receiver,) to claim the full amount as against any interest in the property of Roughan, Ames or Messenger, or any person claiming through or under them.

It should be stated that after Roughan had been removed and Tomlinson appointed trustee, and after the order of June 24, 1895, no action whatever was taken in the case by Tomlinson or the *cestuis que trustent*, so far as the record shows, until February 15, 1896, when Tomlinson filed his supplemental bill reciting the prior proceedings and the various conveyances of the property above mentioned made subsequently to the filing of the original bill, alleging conspiracy and fraud on the part

of Roughan, Ames, the loan association, Messenger, Robinson and others in respect to said conveyances and in respect to the acquisition of the property of the Claremont Company, and alleging intent to defraud Parr and his creditors. The supplemental bill prayed for the specific performance of Parr's contract with the Claremont Company; prayed that the Barnes deed of trust securing the notes to the Putnam creditors be set aside and said notes be delivered up and canceled; that the said several alleged fraudulent conveyances and deeds of trust be set aside and the title to the property be re-vested in the Claremont Company, subject to the lien of the loan association for whatever amount it advanced to take up prior liens on the property.

During the interval mentioned, before the supplemental bill was filed, Roughan was in possession of the property ostensibly under a lease from Ames, who, by the conveyances mentioned, was clothed with apparent ownership, and it was also during this interval that the annex was built and other improvements made. Lot 3 shown on the plat,—a narrow strip of land adjoining the Vincennes building on the south,—was found to be necessary or useful to the building, and was purchased with money furnished by Ames and title thereto conveyed to him in the spring of 1895. Lot 3 never belonged to the Claremont Company, but Ames included it in his deed to Messenger and Messenger included it in his second deed of trust to the loan association.

The court, after a protracted hearing, entered a decree as prayed in the bill, making a voluminous finding of specific facts. It was decreed that Parr's contract with the Claremont Company should be specifically enforced; that the notes of the company, aggregating upwards of $79,000, given to the Putnam creditors in lieu of their shares of stock which they had surrendered, and Barnes' deed of trust, were fraudulent, and they were set aside and ordered to be delivered up and canceled, and

they were also adjudged not to be entitled to any part of said stock. The several deeds of conveyance by which the Claremont Company was divested of its title to the lots in question were adjudged fraudulent and set aside, saving, however, the lien of the loan association for the amounts above stated. Ames was required to convey the property to the company, including also lot 3, on being reimbursed what he had paid for said lot 3, and he and Roughan were adjudged to pay the costs. There were many other provisions of the decree, but as Ames alone has appealed we are concerned only with that part of it which injuriously affects him.

The principal questions to be decided, as presented by this appeal, may be stated as follows: First, is appellee entitled to a decree specifically enforcing against the Claremont Company its contract with Parr; second, if he has such right, is he also, as incidental thereto and to make said contract effective, entitled to have the title to the property in question taken from Ames and re-vested in the Claremont Company and the possession restored to said company; third, if the first and second questions be answered in the affirmative, is Ames entitled to be reimbursed or to have paid to him anything as a condition of such equitable relief, for betterments or improvements put upon the property with money furnished by him; fourth, even if all three of said questions be decided favorably to appellee, is he as trustee, or the Claremont Company, entitled to have Ames' title to lot 3 divested and conveyed to said company. There are other questions, but they are subsidiary to these.

Some contention is made by counsel for appellee that, whether appellee is entitled to specific performance or not, Parr is a stockholder in the Claremont Company, and as such, appellee, as his assignee, is entitled to maintain the bill of complaint for and on behalf of the company to recover property equitably belonging to it and of which it has been defrauded, where its officers and di-

rectors in control of the corporation are parties to such fraud and will not bring suit in its name. It is a sufficient answer to this contention to say that neither the bill nor supplemental bill was framed on such a theory, and neither of them contains apt allegations to support a decree of that character.

Counsel for appellant contend with much force, in the first place, that Parr never performed his contract with the Claremont Company, and for that reason neither he nor his assignee can enforce specific performance against the company. As before said, we are satisfied from the evidence that Parr did not perform his contract as originally made. But at that time the purchase of the title in fee from Briggs was not contemplated. Afterward the company authorized this purchase and the encumbrance of the property to secure the purchase money and the loan from Lehman, and had knowledge of and acquiesced in all that Parr did in and about the completion of the building. True, Parr was the president and a director of the company; but a majority of the directors were the stockholders who had taken stock in payment of their demands created by the Putnam contracts, and it does not appear that the company was then under the control of Parr. The delivery of the company's notes to the extent of $22,000 to such of the Parr creditors as waived their liens on the building, so that the property should be free from encumbrance, to secure this purchase money and the borrowed money, was made by the company and for its benefit as well as for the benefit of Parr, and showed no unfair advantage taken by Parr. These transactions necessarily effected changes in the original contract. They were entered into by mutual consent, as beneficial to both parties, and we have reached the conclusion, from these facts and others contained in the record, that by the subsequent concurrent action of both parties the contract was so far modified that Parr was released from full compliance with the contract as orig-

inally entered into, and that the company, and those claiming through it, are estopped from now setting up, as showing non-compliance by Parr to defeat his recovery, those matters which it agreed to or made necessary by changes which it authorized. If by such changes he should not, as between himself and the company, be entitled to the full amount provided for in the contract as it originally stood, it would not necessarily follow that he should be denied relief altogether, and unless the decree in that respect injuriously affects Ames, he is not concerned with the extent of the relief awarded to appellee. It is, of course, true, that unless the appellee is entitled, under the allegations of his bill, to relief against the company he is not entitled to any relief, nor to have any relief awarded to the Claremont Company, against the appellant,—and this brings us to the contention strongly made by counsel for appellant, that the case made is not one in which a court of equity will enforce specific performance.

It is not claimed that this form of relief is confined to contracts for the conveyance of realty, for relief will not be denied simply because the contract relates to personal property, if there is no adequate remedy at law or it becomes necessary to enforce a trust. (*Parker* v. *Garrison*, 61 Ill. 250; *Cohn* v. *Mitchell*, 115 id. 124; 22 Am. & Eng. Ency. of Law, 990.) We are satisfied there was not, and it is not contended there was, an adequate remedy at law for the complainant in this case. It would have been difficult, if not impossible, to ascertain in a suit at law the damages sustained by the plaintiff. The value of the bonds and stock which Parr was entitled to under his contract was dependent on the title to and encumbrances upon the property in dispute and of which property the company had been fraudulently deprived. The validity of the conveyances by which the company had been divested of its title, and the validity and extent of the encumbrances upon the property and of the debts of the

company, could be determined only in a court of equity. The company was deprived of its property fraudulently, was insolvent, and its bonds and capital stock had no market value. In such a case a contract relating to personal property will be specifically enforced where it would be so enforced if it related to land. 22 Am. & Eng. Ency. of Law, 993, and notes.

Counsel invoke the equitable doctrine that a court of equity will not enforce specific performance where the contract is uncertain, or not fair or just in all its parts, or where its enforcement would impose great hardship on one of the parties to it. The court below found no uncertainty, unfairness or injustice in the contract and we perceive none, though it is doubtless true that as Parr was director and president of the company he could not bind the company by a contract with himself which was unfair or unjust to it, nor could he enforce it specifically without a fair and substantial performance of its provisions on his part. While there was room for contention on this question we are not disposed to disturb the finding of the court below in respect to it. The decree provides that the fruit of the recovery shall be devoted, in the first instance, by the trustee to the satisfaction of the demands of those whose work, labor and materials went into the construction of the building under the contract, and while their rights cannot rise any higher than the rights of Parr, their source, they are entitled to the same equitable consideration. If there is any hardship it does not fall upon the company, but upon those who have wrongfully despoiled it of its property.

Finding, then, that the appellee is entitled to specific performance, it follows that the second question above stated must be answered in the affirmative, and that the complainant had the right, in order to make the relief effective, to have the fraudulent conveyances between the parties to the suit, by which the Claremont Company had been deprived of its property and the title thereto

vested in the present claimants, Ames, Roughan and the loan association, set aside upon sufficient proof of their fraudulent character, as alleged in the bill.

It clearly appears from the evidence in the record that the conveyances from the Claremont Company to Robinson and from Robinson to Messenger were without consideration, and were made for the purpose of divesting the company of its title and of ultimately vesting it in Roughan, in connection with his purchase for $5000 and $3000 to Gartside, of the notes of $79,383.72, secured by the Barnes deed of trust, in order to hinder, delay or defeat Parr and his creditors in their efforts to enforce their demands. Whether Roughan was to cause the title to be held upon any secret trust for others interested in causing the transfer does not appear, but he had it conveyed, without any consideration, to his employee, his foreman, who was a mere dummy in the transaction, and who manipulated the property at the dictation, first, of Roughan, and later of Roughan, Ames and of the loan association, or its agents. Roughan was at the time the trustee of Parr and his creditors under a written instrument then of record in the recorder's office of Cook county, and was the complainant in the bill filed by him in this cause nearly a year before to enforce the specific performance of Parr's contract, in which bill he had alleged that the directors of the company issued the twenty-two notes of the company, aggregating upwards of $79,000, with intent to defraud Parr, and that they made the trust deed to Barnes securing the same with like intent and without consideration, and prayed that said deed of trust be declared fraudulent and void and that it be set aside. Yet, while he was such trustee, he purchased these same notes and deed of trust for his own benefit at but little above six cents on the dollar, and mortgaged the property of the company to pay the purchase money and to pay the company's attorney who aided him in the transaction. It is a proposition too plain for argument that Roughan

could not acquire to himself or for his own benefit any title or interest in this property in violation of his duty as trustee. Although he testified that he had told the Parr creditors that unless they took some action in the matter he would acquire the property for himself, there was no evidence that he had freed himself from the character of trustee which he had previously assumed. Courts of equity exact the utmost fidelity and good faith of a trustee in the performance of his duty to the beneficiary, and will not permit him to deal with the subject matter of the trust for his own benefit. There is, perhaps, at the present day no principle of equity jurisprudence that demands a more rigid enforcement than this. Roughan was incapacitated to deal with the property as he did, and, aside from his violation of duty as trustee, was engaged in a fraudulent transaction to deprive the company of its property without consideration. Without rehearsing the evidence, there was an abundance of it to show that Ames, who acted for himself and for the loan association, and Butts, its secretary, had notice, both constructive and actual, of Roughan's position as trustee, and that with this knowledge they aided and abetted him in his efforts to acquire this property, and to so encumber it and becloud the title as to deceive those entitled to it and to frustrate their efforts to reclaim it, and if Ames' contentions be true, Roughan acted as his agent. The findings of the decree are full and specific on this branch of the case and are sustained by the evidence. Having this knowledge, the association, it seems, paid out on its first loan of $113,000, $81,000, and on its second loan of $65,000, $50,000, and on its third loan of $20,000, nothing. Out of this $81,000 the association paid for the Lehman and Briggs encumbrances on the Vincennes building, and the $50,000 was used for paying for the Briggs note and deed of trust on the "east parcel" of $10,000 and accrued interest, and the rest by Roughan in building the annex. Ames took the legal title, in the first place, by agreement

for the benefit of the association, and the association then held the Barnes deed of trust and notes it secured, and the Lehman note and the two Briggs notes and deeds of trust securing them, none of which had it canceled or released.

In sustaining the decree in so far as it sets aside the Barnes deed of trust and cancels it and the notes it secured, we do not find it necessary to determine whether the directors were in that matter guilty of fraud, or believed, in good faith, that Parr had not performed his contract, upon the faith of which the Putnam creditors had taken the shares of stock for their demands, and that they had therefore the right to surrender such stock and take, and the company had the right to issue, the notes of the company in lieu thereof, as fully as the company had the right to give the $22,000 of notes to the Parr creditors. It must be remembered that this action of the directors was taken the year before the property of the company was conveyed to Robinson and before the Putnam creditors sold their notes and deed of trust to Roughan, and, as the evidence inferentially shows, before that action was contemplated. But as the holders of this stock were in control of the company, the directors themselves owning a large part of it, the action taken in the name of the company would not be binding upon it, but it, the company, might have it set aside. (1 Morawetz on Private Corp. sec. 517; *Higgins* v. *Lansingh*, 154 Ill. 364.) These notes and the deed of trust never passed into the hands of a *bona fide* assignee for value, but were bought by Roughan, under the circumstances above stated, with money borrowed upon the security of a mortgage on the company's property, and which, under the stipulation between the appellee and the association, must, in effect at least, be paid by the company. The original holders of these notes having taken them for their surrendered stock, and having sold said notes, have no further claim either on account of the stock or notes,

and the evidence showing that neither Roughan nor Ames nor the association had any right to them, the decree is right in providing for their cancellation.

As to the right of Ames to hold said lots 1 and 2, it is clear that he never took the title, in the first place, as a purchaser in good faith, but only for the convenience and benefit of the association and to aid Roughan in his schemes of acquiring the property. Later, however, as the evidence tends to show, he conceived the plan of holding the title for himself, not only against the Claremont Company but against Roughan also, for he filed his sworn answer in this suit, in which he claimed absolute title and alleged that he had advanced moneys in the purchase and improvement of the property, and had incurred obligations thereon, amounting in the aggregate to $300,000. The evidence showed that this answer was untrue. Later, during the hearing of the case by other counsel then appearing, he asked leave to amend his answer, offering to surrender the property and his title on being reimbursed to the extent the property had been enhanced in value by the improvements which had been put upon it by means of money furnished by him. Manifestly, from the evidence, he never was in a position to claim more than this, and we are thus brought to the consideration of the third question,—that is, whether or not, as a condition of relief to the complainant, Ames was entitled to such enhanced value created by such improvements.

The evidence tended to prove that Ames advanced to Roughan about $50,000 in building the annex. For this he took Roughan's notes for $57,000, it appearing that he claimed $7000 for furnishing the money. He took from Roughan conveyances of other pieces of real estate already encumbered, to secure these notes and other claims, and certain shares of stock as security, and gave to Roughan his written agreement to re-convey such other real estate on condition the notes and other claims should

be paid as agreed. He sold the shares of stock for about $1000 and transferred or pledged the notes, but testified that he was compelled to take them up, and that he and Roughan had had a settlement respecting the real estate so conveyed to him, which settled everything between them except for the money which he had advanced to build the annex, but that the notes should be credited with the amount he had received for said stock. Roughan was not called as a witness relative to the merits of the case, but just before the evidence closed appeared and was permitted to testify in his own behalf. He produced a contract signed by Ames, which contained an agreement of Ames to convey to him, Roughan, the property in controversy, as well as said other real estate, upon payment by Roughan of his said notes and indebtedness to Ames; but it was clearly shown that the part of this contract containing the agreement to convey the property in controversy had never been signed by Ames, but had been typewritten, and prefixed and fastened to the agreement which Ames had previously signed,—in other words, had been forged. But we regard this later controversy between Ames and Roughan as of no importance in determining which of them made the improvements, for it is clear to us that neither of them can in a court of equity be heard to claim any such right. This part of the case, however, tends further to prove the lack of good faith of both Ames and Roughan, without which they could not be allowed anything for improvements which they had put upon the company's property while claiming title. It is not a mere question of notice, actual or constructive, to Ames and Roughan of the pendency of this suit or that their title might prove defective, and we are not called upon to consider the authorities cited nor the contention made that in many such cases, dependent upon the circumstances, a court of equity will require, as a condition of relief, that the complainant, in observing the maxim he who seeks equity must do equity,

shall pay for improvements, or, rather, the amount which the property has been enhanced in value by such improvements.  This is not a case of mere constructive fraud or fraud arising by implication of law, but fraud in fact, and the improvements were not made upon the property by Ames or Roughan in good faith, under the honest belief that they or either of them owned the property, although they may have been advised by counsel, as the evidence tends to show they were, that their title could not be defeated.  The rule is practically without exception that good faith is essential to maintenance of such a claim, and even the maker in good faith of such improvements is often compelled to surrender the property to the owner of the superior title without pay for the improvements. *Dart* v. *Hercules*, 57 Ill. 446; *Cable* v. *Ellis*, 120 id. 136; *Shaw* v. *Hill*, 46 Ark. 333; *Lagger* v. *Mutual Union Loan Ass.* 146 Ill. 283; *Williams* v. *Vanderbilt*, 145 id. 238; 10 Am. & Eng. Ency. of Law, 247; *Mathes* v. *Dobschuetz*, 72 Ill. 438.

It is argued, however, that the suit was not prosecuted with diligence, but was suffered to lie dormant from the time Tomlinson was appointed trustee, in 1895, until he filed his supplemental bill, February 15, 1896, and that it was during this interval that the annex was built. Various orders were made in the case after Tomlinson was appointed, and Roughan and Ames and the loan association appeared to engage in a race with the court to avoid its injunctive orders, and it clearly appears they had sufficient notice of the intention of the trustee and the beneficiaries to prosecute the suit.  We cannot hold as a matter of law, nor under the facts, that the latter parties were guilty of *laches* and thereby lulled Roughan and Ames into security, thus inducing them to improve the property as their own.  Our conclusion on this branch of the case is, that the trial court did not err in refusing to impose, as a condition of setting aside the conveyances by which the title to lots 1 and 2 was vested in Ames and of re-vesting it in the Claremont Company, that the com-

plaintant or the Claremont Company should pay to Ames the enhanced value of the property created by the improvements.

The only remaining question relates to that part of the decree requiring Ames to convey to the company lot 3 on being reimbursed the purchase money, and, as affecting lot 3, making it subject to all of the second encumbrance of the loan association in excess of $25,000,—the amount to which said encumbrance was reduced by the stipulation between the complainant and the association as between themselves. It must be remembered that lot 3 never belonged to the Claremont Company, and neither that company nor Parr or his beneficiaries ever had any interest in it, but it was purchased by Ames with his own money from strangers to the transactions giving rise to this suit. It was alleged in the bill that Ames or Roughan purchased it with rents and profits of the Claremont property, but there was no proof of this allegation, and we are of the opinion that this part of the decree is erroneous. The mere fact that this lot adjoined the Vincennes building and was useful to it can make no difference. There was no evidence that Ames bought it for anybody but himself, and his wrongful acts in dealing with lots 1 and 2 are, under the evidence, immaterial as affecting his title to lot 3. To divest him of his title to lot 3 and vest it in the Claremont Company would be but the enforcement of a penalty or forfeiture by decree in chancery, and this, equity will not permit.

There is, however, a more serious question respecting the encumbrance upon this lot, growing out of the stipulation between the complainants and the association reducing this encumbrance to $25,000 as to the Claremont property. This encumbrance was for $65,000, covering lots 1, 2 and 3, but under which the association advanced only $50,000, which $50,000 was used, as before stated, towards building the annex on the "east parcel" and purchasing the Briggs encumbrance on that parcel. No part

of it was expended on lot 3. Ames had conveyed lot 3 to Messenger, and Messenger included it with lots 1 and 2 in the mortgage. It was, of course, thereby bound with lots 1 and 2 for the payment of that indebtedness. But by the stipulation and the decree it is made subject to the face amount of that encumbrance, less the $25,000, which is made a lien on lots 1 and 2. In view of our holding as to lot 3, such a provision in the decree would, in our opinion, be erroneous. It would as effectually, though indirectly, deprive appellant of the lot as would the other provision of the decree requiring him to convey. Equity having taken jurisdiction will dispose of all the questions involved. The effect of the stipulation is to release lots 1 and 2 of all the encumbrance except $25,000. This was done without notice to or consent of the owner of lot 3. It does not follow that because he forfeited all rights in respect to lots 1 and 2 because of fraud in obtaining the true owner's title thereto, he has no equitable rights demanding the protection of the court in respect to lot 3. As he was guilty of no fraud in acquiring lot 3, but had a right to acquire it and do with it as he pleased, he must be treated, in dealing with his rights in respect to it, as one innocent of wrongdoing. As between him and the association he is entitled to have the transaction considered precisely as it took place. As between them, Messenger was the mortgagor, the association the mortgagee, and Ames the purchaser from Messenger subject to the mortgage. Ames then held the title to lot 3 absolutely, but held the title to lots 1 and 2 in trust for the Claremont Company. As to one he was the actual and beneficial owner; as to the others the company was the beneficial owner. Such being the case, and especially in view of the knowledge of the association that the entire consideration of that mortgage was expended in improvements and to remove liens on the company's said property, the stipulation of the association releasing lots 1 and 2 from all of that encumbrance except for $25,000 must, as be-

tween Ames and the association, be held to release lot 3 at least *pro tanto* if not altogether, for it was not in the power of the association and the complainant, by agreement between themselves, to increase the encumbrance on lot 3 or to deprive its owner of all security afforded by the encumbrance on lots 1 and 2. We are of the opinion that the principle applies, that where the mortgagee has knowledge that two parcels of land covered by his mortgage have been conveyed to different subsequent purchasers by the mortgagor, he cannot release one parcel without also releasing the other *pro tanto* or altogether, according to the circumstances. Thus it is said in 1 Jones on Mortgages: "If the mortgagee, after actual notice of absolute sale of a portion of the premises by the mortgagor, releases other portions, the mortgage is discharged wholly or *pro tanto*, according to the circumstances, upon that part owned by such subsequent purchaser." "The purchaser * * * of the part remaining may insist on a credit upon the mortgage debt of a sum equal to the value of the property released." See, also, *Hawhe* v. *Snydaker*, 86 Ill. 197.

Inasmuch as the decree required Ames to convey lot 3 to the Claremont Company this question was of no great importance from that view of the case, as Ames was not personally liable on the Messenger encumbrance. But as we have concluded that Ames should not be required to convey lot 3, it becomes necessary to determine whether that lot should or not be discharged, wholly or in part, from the lien of that encumbrance. The company's property, lots 1 and 2, and especially the "east parcel" containing the annex, was enhanced in value by that building and by removing the Briggs encumbrance on it, in an amount in excess of this entire second encumbrance, and in view of the stipulation between complainant and the association we are of the opinion that the decree, in giving that stipulation its proper effect under all of the circumstances, should have provided that lot 3 be released

altogether from the said encumbrance, and that the lien of that encumbrance, to the amount of $25,000 as stipulated, should have been declared to rest upon and bind only the property of the company described in it, but not said lot 3. Whether the principles governing the release of part of the mortgaged property after sale by the mortgagor be strictly applicable or not, such a decree would obviate the necessity of enforcing a forfeiture in equity, which equity abhors, and would give the Claremont Company its own with all the improvements, subject to the mortgage debt stipulated to rest upon it by the complainant and the mortgagee,—in other words, would do complete equity.

The decree must be reversed and the cause remanded, with directions to modify the decree or to enter another decree in accordance with the views herein expressed. The costs in this court will be taxed against the appellee.

*Reversed and remanded.*