MISSISSIPPI GLASS CO. v. FRANZEN.

(Circuit Court of Appeals, Third Circuit.    February 2, 1906.)

No. 55.

1. WITNESSES—PARTY CALLED BY OPPOSITE PARTY—RIGHT TO CONTRADICT TESTIMONY.

A party who calls the opposite party as a witness is not concluded by his testimony, but may contradict him.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 1097, 1269.]

2. PATENTS—CONTRACT TO ASSIGN—EVIDENCE CONSIDERED.

Evidence considered, and *held* to fairly sustain the claim of complainant that certain inventions, made by defendant, and for which he applied for patents after leaving complainant's employment, were made during the term of such employment, and were within the terms of a contract by which he agreed to assign to complainant all rights to any inventions made by him while the employment continued.

3. SPECIFIC PERFORMANCE—CONTRACT TO ASSIGN INVENTIONS—CONSIDERATION AND MUTUALITY.

A written contract by an employé, by which he agreed, in consideration of his employment at a stated salary, to assign to his employer all inventions made by him during the term of his employment, which was terminable at any time by either party on notice, is based on a sufficient consideration, and does not lack mutuality, and is specifically enforceable in equity, where it has been fully executed by the employer by retaining the employé until he voluntarily left its service.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 71; vol. 44, Cent. Dig. Specific Performance, § 204.]

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

For opinion below, see 138 Fed. 924.

A. J. Baldwin and Wm. L. Pierce, for appellant.

Marshall A. Christy, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. The Mississippi Glass Company (here the appellant) filed its bill in equity in the court below against Nicklas Franzen to compel the defendant to assign to the complainant letters patent of the United States, No. 741,125, dated October 13, 1903, granted to the defendant upon an application filed June 17, 1903, for a novel method of manufacturing that class of glass having wire imbedded therein, and commercially known as "wire glass"; also to assign to the complainant his application, serial No. 164,495, for a patent for the apparatus involved in said method. The defendant entered the employ of the complainant at its wire glass factory at Port Allegany, Pa., as assistant superintendent, on the 5th day of September, 1901, at the salary of $100 per month; the contract providing that either party might terminate the employment by giving 15 days' notice in writing to the other. This paper bears date August 31, 1901, but before the employment began, and before the defendant was permitted to enter the complainant's glass works, he signed and affixed his seal to a written contract bearing date September 4, 1901, which contains the following provisions:

"First. The employer is engaged in the manufacture of glass, glassware, and mechanical devices in connection therewith, and that such manufacture is carried on by means of certain secret formulas, methods, processes, tools, machinery, patterns, and appliances, and the same are the property of the employer, and intended to be kept and guarded by the employer as secrets; and that all knowledge and information which the employé now possesses, or shall hereafter acquire, respecting such secrets, and all inventions and discoveries made by said employé during the term of his employment, shall at all times, and for all purposes, be regarded as acquired, and held by the employé in a fiduciary capacity, and solely for the benefit of the employer."

"Fourth. That the employé will, when required, make and execute any and all assignments in writing which may be deemed by the employer proper and necessary to transfer and vest in the employer the entire right, title, and interest in all inventions and discoveries made by the employé during the term of his employment."

The defendant remained in the complainant's service, under his contract of employment, until the 9th day of May, 1903, a period of over a year and eight months, when he voluntarily quit the complainant's service. The bill of complaint alleges that the inventions in question were made by the defendant during the term of his employment with the complainant.

The defendant interposes two defenses to the bill, namely: First, that the inventions in question were not made by him during the term of his employment with the complainant, but prior to his entering its employ; second, that the contract was not enforceable in equity, being without consideration and not mutual. The court below dismissed the bill upon the ground that it was not affirmatively proven that the defendant made the inventions during the term of his employment with the complainant.

In our treatment of the case we will first consider the question of fact as to when the inventions were made by the defendant. And here we have to say that notwithstanding the complainant called Franzen, and examined him, inter alia, as to the time when his inventions were made, the complainant is not concluded by what he testified, or prevented from contending upon the whole evidence that the inventions were actually made while Franzen was in its employment, although he asserted the contrary when on the witness stand. A party who calls the opposite party as a witness is not bound by his testimony, but may contradict him. 1 Whart. Ev. §§ 484, 489. The case of Dravo v. Fabel, 132 U. S. 487, 490, 10 Sup. Ct. 170, 171, 33 L. Ed. 421, decides nothing to the contrary. Speaking of the testimony of the defendants, whom the plaintiffs made their own witnesses, the court said:

"While the plaintiffs were not concluded by their evidence, and might show they were mistaken, it could not be properly contended by the plaintiffs that they were unworthy of credit. The evidence must be given such weight as under all the circumstances it is fairly entitled to receive."

The evidence shows that before Franzen came to the Port Allegany works he had been employed as a workman in plate glass factories, but never in a wire glass factory; that he never had made any wire glass, and (according to his own testimony) had never seen wire glass made, save on one day in 1897 or 1898, when he visited the

Davis Glass Company's works at Latrobe, Pa. Lemaire, the manager at the complainant's works, who hired Franzen, testifies that at his first interview with Franzen this occurred:

"I asked him whether he knew anything about the making of wire glass, and he said he did not, in any way; that he had never anything to do with wire glass."

Freeman, the master teaser at the complainant's works, testifies that Franzen told him "that he knew nothing of wire glass"; and Eley, another employé at the complainant's works, testifies that Franzen "told me that he never had seen any wire glass made before he entered the employ of the company, and he had no idea of it whatever." Franzen admits that he may have said to these witnesses that he had never made any wire glass, but denies that he said anything more. Franzen claims, and has testified, that he made the two inventions in question before he left the plate glass works at Walton in 1901, and before he came to the complainant's works at Port Allegany. Nevertheless he did not apply for a patent until June 17, 1903, and not until after his 20 months' experience in the complainant's wire glass factory. Franzen testified that he first made sketches or drawings of the inventions in question, "perhaps eight or nine years ago" (i. e., in 1895 or 1896), adding, "I assume that I made drawings similar to that method over 10,000 times until I came to what is patented now." These drawings he testified were made "some time after 1888 until 1889, when my idea was completed, when it was firm in my mind how to accomplish the best method of manufacturing wire glass." When asked if he had in his possession any drawings substantially the same as those of his patent, he answered:

"I think they are all destroyed, but there is a possibility there may be one yet. That would be small sheets; rough sketches. The regular drawings, they are all destroyed."

He testified that he first consulted counsel about the subject of his invention in the beginning of June, 1903, when he went to Washington and saw Mr. Foster, a patent lawyer, and that he took with him two rough sketches, which were made in 1898 or 1899, or it might be long before, adding:

"There was a bunch of them made, and after I picked out what I wanted of them, the rest I burned."

In answer to the question, "Are these two sketches in existence?" he replied:

"A. No, sir; I don't think I have them. I brought them home with me from Washington. When I seen the lawyer in Washington, I showed him those sketches. He made a better sketch himself, then, so he would probably better understand it. After the explanation was through, I took my papers, and the lawyer took what he made there, and told me that was sufficient."

Now, after this testimony was given by Franzen, the complainant put in evidence nine sketches or drawings relating to the patented invention, eight of which it was shown Franzen had submitted to Mr. Foster just before the patent was applied for. These eight sketches or drawings, when laid before him, Franzen admitted were

made by him at Port Allegany in May or June, 1903. The ninth drawing was made by Mr. Foster at Washington. Four of the above-mentioned eight sketches or drawings which Franzen made in May or June, 1903, were on sheets of the office stationery used by the Mississippi Glass Company at its Port Allegany works. To the question, "What actual trials have you ever made of the method of the patent in suit, to make wire glass by the same?" Franzen replied:

"No actual trials at all; just by knowing the nature and the working of hot glass with other metals, learned me that the method of making wire glass by my patent would work."

Four of the complainant's employés testify that, about two months before Franzen left the complainant's service, they were present when Franzen made experiments in the manufacture of wire glass at the complainant's works. This took place on a Sunday night after midnight, outside of the regular running time of the factory. Franzen arranged the machinery in the manner shown in his letters patent No. 741,125, with three rolls, and conducted three experiments introducing the wire at different points. One of the sheets produced was made by the identical method described and claimed in and by the letters patent. Franzen had prearranged with these persons to have them present on this occasion. One of them (Totten) was the night engineer, and he testifies that several days before Franzen had asked him to start the engine on this Sunday night, as he wanted to do some work on the tables. Franzen cautioned each of these four persons not to say anything about the experiment. Franzen admits that the midnight and secret transaction, testified to by the other witnesses, took place, and that wire glass was then made by the method stated in the first claim of his process patent No. 741,125; but he denies that it was a test of his method, or intended so to be. His explanation is that his purpose was to discover what caused glass manufactured at the works to be "lappy," or seamy.

It appears from the evidence that the eight sheets of drawings which Franzen made at Port Allegany in May or June, 1903, and submitted to his patent attorney, and from which the latter produced the drawings of the method patent No. 741,125, show the following apparatus, all of which were used at the complainant's factory in the manufacture of wire glass during the time Franzen was there employed, namely: A moving table, a water-cooled roll, a bracket or yoke, a gunn or guide projecting over and on top of roll 3, and a screw plate, spring, and pressure screw above the uppermost roll. Franzen states that he saw a moving table and a gunn or guide at the St. Gobain works at Stolberg, Germany, in 1888, but admits that he first saw a water-cooled roll for the manufacture of wire glass at the complainant's factory at Port Allegany, and says that he does not know whether or not the bracket or yoke was used anywhere else. Franzen admits that the apparatus described in his application, serial No. 164,495, and that shown in his method patent, are substantially the same.

Jacklin, an employé of the complainant, testified that Franzen told him as a reason for leaving that "he wanted to apply for a patent,

and couldn't do it while he was employed by the Mississippi Glass Company." Millard, an employé of the complainant, testified that Franzen told him he was going to quit, assigning as the reason that "he was going to get a patent, and he had to quit before he could get it." John H. Freeman, an employé of the complainant, testified that Franzen, shortly after he left the employ of the complainant, attempted to interest him in a co-operative company for making wire glass under an invention of his, and the witness states:

"I said to him, 'Nick, this probably is borrowing trouble.' He says. 'Why?' I says, 'On a secrecy contract.' He says, 'The secrecy contract don't amount to a damn.'"

The witness states that Franzen did not intimate that he had made the invention before he entered the complainant's employ. John A. Clay, an employé of the complainant, testifies that he had a conversation with Franzen after he had left the company's employ about starting a co-operative company under his patent; that he (the witness) asked Franzen if it was practical, and Franzen said he knew it was. And in answer to the question, "And how was it Franzen knew it was practical?" the witness testified, "He told me he had tried it; he had tested it." And that in answer to the further question, "And tested it where?" Franzen said, "At Port Allegany, at the Mississippi Glass Factory."

The defendant testified that he had never shown the drawings illustrating his invention to any one, but that he had "roughly" explained his invention to Charles and William Mickey, who at the time were his fellow workmen at Walton, telling them "that it was possible to make separate sheets and unite them into a solid sheet again, or something in the meaning of— I mean I meant to tell them that. I may have used other words, and I believe that I spoke to them that wire glass could be made, making two separate sheets and put the wire between." These men Franzen called to corroborate himself. William Mickey testified that Franzen, upon his return from a visit to Latrobe, had said: "I have a better idea of manufacturing wire glass than any I have ever seen yet." Charles Mickey is much more definite as to what Franzen said, and, indeed, he goes far beyond what Franzen himself states he explained to him. Franzen produced a small book, which he stated he used at Walton for "sketches, memoranda, and such things"; but we do not see that it contains anything that sheds light upon the matter in controversy.

In the nature of the case, it was scarcely to be expected that the complainant could prove that the inventions in question were made during the term of Franzen's employment by the direct or positive testimony of any witness speaking from his own actual or personal knowledge. Naturally the complainant's reliance would be on circumstantial evidence, which often leads to a conclusion more satisfactory than direct evidence can produce.

This record, we think, presents circumstantial evidence which fully justifies the conclusion that the inventions in controversy were made by Franzen during the term of his employment with the complainant. Prior to his employment, Franzen had not made any wire glass,

nor had he worked in a wire glass factory. His own declarations (which we regard as satisfactorily proven) at the commencement of his employment in the complainant's factory, were that he knew nothing whatever about the making of wire glass. According to his own admission, he had never made, before he came to Port Allegany, any trial or test of the practicability of the method of manufacturing wire glass which he claims he had long previously conceived. He produces no contemporaneous or anterior drawing illustrating either of his inventions—the process or the apparatus. His delay in applying for a patent is extraordinary and inconsistent with the completion of the invention at the time he alleges. It is a fact almost controlling that the invention was first put in operative form in the complainant's factory and by Franzen during his employment there. The secrecy and concealment from his employer of his experiments on that occasion discredit his claim that he perfected his invention before his employment began. Franzen's explanation that his Sunday night experiments were for the purpose of discovering the cause of "lappy" glass is not reasonable. Franzen's application for a patent was made only 39 days after he had voluntarily left the complainant, and his avowed reason for leaving was that he wanted to get a patent, and could not while he was employed with the complainant. His drawings, which formed the basis of his application, were made by him at Port Allegany in May or June, 1903, and four of them were upon stationery then in use in the complainant's office. The statement of Franzen that he took to his patent attorney in Washington two rough sketches made in 1898 or 1899—implying that the patent application was prepared from those two sketches—is disproved; the drawings submitted by him to Mr. Foster being those made in May or June, 1903. Moreover, these drawings illustrate the very apparatus then in use in the complainant's wire glass factory, some of which Franzen had never seen anywhere else, and which it is incredible could have entered into his mental conception at the time he alleges he made the inventions.

And here we may observe that a mere mental conception, not tested or reduced to practice, nor followed by any embodiment of the idea, is not invention. Upon the whole evidence we are entirely convinced, and accordingly find, that the inventions in question were made by Franzen during the term of his employment with the complainant.

We now pass to the other branch of the defense, namely, that the contract was not enforceable in equity upon the theory of lack of consideration and lack of mutuality. This contract, however, was not without consideration. It was not only by its own express terms in consideration of the employment of the defendant, but this contract was signed and delivered before the employment actually commenced, and before the defendant was permitted to enter the complainant's factory. The two papers dated August 31st and September 4th constituted one transaction. The hiring, the engagement to pay wages, and the introduction of the defendant into the complainant's establishment and to its methods and processes, constituted a valid con-

sideration for his agreement to assign his inventions made during his term of employment. This question was considered by the Circuit Court of Appeals for the Fourth Circuit in the case of Hulse v. Bonsack Machine Co., 65 Fed. 864, 13 C. C. A. 180, and it was there held that a contract of this character was founded on sufficient consideration, and was valid and enforceable specifically in equity. In Thibodeau v. Hildreth, 124 Fed. 892, 893, 60 C. C. A. 78, 79, 63 L. R. A. 480, which involved a contract between an employer and employé similar to the one here, and based on the consideration of employment, the Circuit Court of Appeals for the First Circuit said:

"This contract is neither unconscionable nor against public policy. Such an agreement is not uncommonly made by an employé with his employers, and it may be necessary for the reasonable protection of the employer's business."

The same doctrine is laid down by Robinson in his work on Patents (volume 1, § 414).

We are unable to accept the proposition that the contract here in question lacked mutuality. Undoubtedly there was reciprocity of obligation. Moreover, we are dealing with an executed contract. The defendant enjoyed the benefits of his contract for a periòd of over one year and eight months, and then left of his own accord. He is therefore in no position to question the right of the complainant to equitable relief by decree for specific performance.

The doctrine of nonenforceability in equity of a contract for lack of mutuality has no application to an executed contract. Green v. Richards, 23 N. J. Eq. 32, 35; Hulse v. Bonsack Machine Co., supra; Grove v. Hodge, 55 Pa. 504, 516. In the last-cited case the court, speaking by Judge Strong, said:

"Want of mutuality is no defense to either party, except in cases of executory contracts. It has no applicability to an executed bargain. There are many where the obligation is all upon one party. As to one the obligation was fulfilled, the contract was executed, when it was made. As to the other party, it remained executory. A consideration may be either something done, or something to be done, or a promise itself. When it is something already done, it is idle to talk of want of mutuality. That is to be considered only when the obligations of both parties are future.".

With reference to the argument based upon clause third, it is enough to say that there was no breach of contract by the employer, and hence the provisions of that clause become altogether immaterial and inapplicable under the facts of this case.

We think both defenses ought to have been overruled, and that a decree for specific performance should have been entered in favor of the complainant. Accordingly the decree of the Circuit Court is reversed, and the cause is remanded to that court, with directions to enter in favor of the complainant a decree of specific performance in respect to both the inventions, in accordance with the prayers of the bill.