[No. 1758]

## W. E. TURLEY, RESPONDENT, v. W. B. THOMAS AND C. J. BOWER, APPELLANTS.

1. CORPORATIONS—SALES OF STOCK—VALIDITY—CERTAINTY.

A contract that, in consideration of an agreement by defendant to transfer to plaintiff and another a specified number of shares of corporate stock, they "will to the best of their ability use their best energies toward securing the sale of treasury stock in such company, and do all in their power to assist in advancing the interests of such company," is not too indefinite to be binding, though no time is fixed for performance, and the acts to be performed in securing a sale of the treasury stock are not specified, where plaintiff and such other have performed their part of the contract to the extent of securing subscribers for all the shares contemplated to be sold at that time.

2. CONTRACTS—CONSTRUCTION—JOINT OR SEVERAL.

Where there are no express words to render joint and several the obligation undertaken by two, it is presumably a joint liability.

3. APPEAL AND ERROR — REVIEW — QUESTIONS OF FACT — CONFLICTING EVIDENCE.

The findings of fact by the trial court on conflicting evidence will not be disturbed on review.

4. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—CONTRACT TO DELIVER CORPORATE STOCK.

A contract for the delivery of corporate stock will be specifically enforced in equity, where the stock has no market value and an action for damages for breach of the contract would be inadequate.

5. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—MUTUALITY.

A contract for the delivery of corporate stock in payment for personal services to be rendered, though unenforceable specifically at the time it was made, may be so enforced after the services contracted for have been rendered.

6. APPEAL AND ERROR—QUESTIONS NOT RAISED AT TRIAL.

Appellant is not entitled to have a note filed in the case as an exhibit canceled on appeal, where this was not asked in the trial court.

7. APPEAL AND ERROR — REVIEW — HARMLESS ERROR — ADMISSION OF EVIDENCE.

The error of admitting evidence on cross-examination not within the scope of the witness's direct examination is harmless where the fact testified to was fully shown otherwise.

8. APPEAL AND ERROR—REVIEW—HARMLESS ERROR.

A decree directing the delivery of corporate stock to plaintiff will not be disturbed because the action was brought while the stock was held in pool by a third person, where the period of the pool has expired.

APPEAL from the District Court of the Second Judicial District of the State of Nevada, Washoe County; *John S. Orr*, Judge.

Action by W. E. Turley against W. B. Thomas and C. J. Bower. From a decree for plaintiff, defendants appeal. **Affirmed.**

STATEMENT OF FACTS

Under date of August 21, 1906, the appellants, Bower and Thomas, who were doing business as copartners under the firm name of Nevada Real Estate Mining and Development Company, entered into a contract with the Selby Consolidated Mining and Milling Company, wherein it was recited that this company was desirous of arranging for the procurement of funds to be used in the development of its mining claims, and wherein it was agreed that in consideration of their acting as the agents and promoters of the company the latter would increase its capital stock from 300,000 to 1,000,000 shares, that one-third of this increased capital stock should be treasury stock, and that the other two-thirds thereof should be divided, one-half thereof to the stockholders of the company at that time, and the other one-half to these appellants. It was also agreed therein that all stock outside of the treasury stock should be pooled for one year from that time.

Two agreements bearing date on that day were executed and signed by those parties carrying several similar provisions, and apparently intended for the same purpose, but one of which was more complete and detailed in its provisions. One provided that it was conditioned upon the parties who are appellants here raising, through the sale of treasury stock or otherwise, the sum of $15,000 with which to begin operations, while the other provided that they must raise at least $1,500 for that purpose; and in both that they should use their best endeavors and abilities to sell treasury stock to secure funds for the prosecution of the work. It seems that the one providing for $15,000 was not executed until several days after its date.

There is testimony to the effect that a day or two later, or on or about August 23, 1906, appellants offered one Edwin Arkell one-fourth of the promotion stock to which they were entitled under this contract which they had just made with the Selby Consolidated Mining and Milling Company for the

promotion of that company, if he would furnish them with $500. Arkell was unable to supply that amount, but he brought to the appellants the plaintiff, Turley, who wished to see the company's properties before accepting the proposition, but was informed by them that the $500 must be paid by noon that day or the deal would be off. Thereupon Turley declined, and, with Arkell, left appellants' office, but subsequently returned; and it is testified he agreed to accept the offer, if Bower and Thomas would give them some guaranty for the $500, and that appellants then agreed to give them their note for the amount, payable on or before ninety days after date; that Turley and Arkell understood that the $500 was paid to preserve the rights of appellants in their contract with the company; that they were to be repaid if the contract between the appellants and the company was not consummated, but otherwise the note was to be canceled. On the other hand, appellants testified in support of their claim that the $500 was merely a loan to relieve them from financial embarassment; that they were willing to let Arkell in on the proposition, if he would help promote it and loan them the money for ninety days; and that, if plaintiff and Arkell had not loaned them the $500, they never would have made any agreement with them.

Aside from this conflicting testimony, a note dated August 23, 1906, for $500, payable ninety days after date to W. E. Turley and Edwin Arkell, and an indorsement on the back thereof to the effect that the note would be due and payable thirty days from its date in the event that the Selby Consolidated Mining and Milling Company should not have increased its shares to 1,000,000, were signed and delivered by appellants, who received $250 from plaintiff and a like sum from Arkell; and at the same time the following agreement was also executed:

"Whereas, the undersigned, Wilmer B. Thomas and Charles J. Bower (of the Nevada Real Estate Mining and Development Company) are entitled to one-third ($\frac{1}{3}$) of the capital stock of the Selby Consolidated Mining and Milling Company's stock of Nevada, as promoters, under and by virtue of a

certain contract made between the said Selby Consolidated Mining and Milling Company and the undersigned. Said contract dated August 21, 1906.

"Now, therefore, in consideration of one.($1) dollar to us in hand paid, the receipt whereof is hereby acknowledged, and of other valuable considerations, we, the undersigned, hereby contract and agree to transfer and deliver to W. E. Turley and Edwin Arkell one-fourth of our promoters' interest, being 83,250 shares, which stock is to be transferred as follows: 41,625 shares to the said W. E. Turley, 41,625 shares to said Edwin Arkell.

"It is understood and agreed that this agreement is subject to the receipt of such stock from said Selby Consolidated Mining and Milling Company to the undersigned.

"It is further understood and agreed that said W. E. Turley and Edwin Arkell will, to the best of their ability, use their best energies towards the securing of the sale of treasury stock in such company, and do all in their power to assist in advancing the interests of such company.

"It is understood that all promotion stock shall be pooled.

"Nevada Real Estate M. & D. Co.

"By W. B. Thomas.

"C. J. Bower."

As had been agreed, the stock of the Selby Company was increased to 1,000,000 shares, and about September 1st the company authorized the sale of 100,000 shares of its treasury stock at 20 cents per share.

A day or two after the execution of the note and this agreement, a subscription paper was prepared by appellants and Arkell, and after being typewritten in their office was delivered to him. Beginning about September 1st, plaintiff and Arkell, armed with this one paper between them, went around soliciting and obtaining subscriptions for the treasury stock of that company. Arkell kept the list, and plaintiff went with him and introduced him, as the plaintiff knew more people than Arkell. Later, it was thought more advantageous to have plaintiff first introduce Arkell to several of the persons approached, and then have Arkell solicit subscriptions from them alone. There is contradicted evidence to the effect that

plaintiff kept working on the proposition until October. At many times he took people to the office of the Selby Company in Reno to see the ore; that he wrote more than one hundred letters to persons in the East; that several of the people to whom he introduced Arkell bought stock—Thomas told him that $12,000 worth of stock had been sold. At the time the subscription list went out from appellants' office there was placed upon it a number of fictitious subscriptions for stock, and also the names of prominent people who had been given or promised shares in order to make it appear that they were subscribers or interested in the promotion of the company. Bower, the secretary of the company, and the president on October 10, 1906, deposited with the Washoe County Bank a pooling agreement dated October 6th, with the shares issued to the old stockholders of the company and the promoters.

Plaintiff and Arkell testified that about the time of these dates in October they went to appellants' office and inquired whether their stock had been put in the bank, and were led to believe that it had been placed there for them; but appellants deny that they were so told, although admitting the use of language from which such inference might have been drawn. Arkell ascertained that his stock had not been placed in the bank, and insisted upon and succeeded in having it placed there in escrow with the other. Appellants did not complain about respondent's services at that time, and they were willing that he should believe that his stock had been pooled, although it had not been placed in the bank. The 100,000 shares of treasury stock, which about September 1st had been authorized to be placed at 20 cents a share, was mostly sold by the 20th of October, excepting some that the subscribers failed to take. One witness testified that all of it had been subscribed for by about the middle of October, and Thomas stated on the stand that all of this stock had been sold, and that notice to that effect had been given in the paper for several days prior to the receipt of a telegram sent from California by plaintiff, which was an order for more stock that was not filled. Plaintiff wrote a letter about the same time asking for a commission on the sale of this stock,

stating that he had been to the expense of a special trip to see the intending purchaser. He testified that he desired the commission to pay to the party who had notified him and assisted him in obtaining the order for this stock, who asked for the commission. Upon plaintiff's return from San Francisco on November 25th after an absence of about twelve days, he was informed by Arkell that his stock was not in the bank. Upon inquiring next day at the office of appellants, he was told by Bower that they had concluded to repudiate the contract, that they were not going to deliver the stock, and he was referred to their attorney. There is some dispute as to whether dissatisfaction was expressed at this time regarding respondent's services, but he testified that no particular complaint was made to him concerning his efforts to sell stock and fulfill his contract at that time or prior thereto. Any subscription he had obtained was accepted by appellants down to the time of his letter and telegraphic order, which was refused about November 21st, which was after the notice had been published that the 100,000 shares offered had been sold. This suit was commenced on December 1st following to enforce the delivery to the plaintiff of 41,625 shares, being his one-half of one-fourth of respondent's one-third of the stock of the Selby Company. It is alleged in the complaint that, after the stock of that company had been increased as stated, the company had no money or means other than its treasury stock with which to develop its mines; that plaintiff and Arkell had complied with the terms of their agreement, and plaintiff through his diligence had sold stock for which the company had received about $12,000 in cash; that with the money the mine belonging to the company had been worked and developed, and thereby the property and stock of the company had appreciated in value and would still further increase, and that by means of the money so realized the stock had increased from 20 cents to about 70 cents a share, and would further increase as the property was developed; that the extent of the increase in the value of the stock cannot be definitely ascertained, but continued working of the property would increase the stock largely, the exact amount of which could not be stated, but

it was impossible for the plaintiff to more specifically state the value of the stock or the amount of damages he had suffered by failure of the defendants to comply with the terms of their contract; that he had no adequate remedy at law, for the reason that a judgment at law would not meet the demands of justice, and that the same would be less beneficial than relief in equity; that the damages he had sustained could not be ascertained or exactly shown, and that any remedy at law would be attended with doubt and difficulty and would be inadequate. Among others, the court made the following findings, to which exception was taken:

"Sixth—That under and in pursuance of said contract, and in compliance with the terms thereof, the said W. E. Turley and the said Edwin Arkell duly performed all the conditions on their part to be performed under said contract; and the said W. E. Turley, the plaintiff herein, has performed every act and thing required of him under and by virtue of the terms of said contract.

\*  \*  \*  \*  \*  \*  \*  \*

"Tenth—That said capital stock, at and before the commencement of this suit, had no market value, and that the value thereof, at the time the contract was made and entered into between the plaintiff and the said defendants, depended upon the operation and development of the property owned by the said Selby Consolidated Mining and Milling Company, and the continued development and operation thereof; that the development of the property owned by said company, by the continued operation thereof, shows a progressively increased improvement therein; that the value of said stock cannot be exactly shown, or definitely ascertained, and that the continued working and developing of the property of said mining company will increase the value of said property and the value of said stock; and that there is no method of ascertaining the amount of damage that plaintiff has sustained, or will sustain, by reason of the failure and refusal on the part of the defendants to transfer and deliver to said plaintiff the amount of stock to which he was entitled under said contract.

\*  \*  \*  \*  \*  \*  \*  \*

"Eleventh—That by reason of the performance of said con-

tract by the plaintiff and the said Arkell, on their part, the means were obtained by which the Selby Consolidated Mining and Milling Company were enabled to work and develop said property and render the stock thereof valuable.

Conclusions of law were found in favor of the plaintiff, and judgment entered accordingly.

*S. McDowall* and *Albert D. Ayres*, for Appellants.

*Cheney, Massey & Price*, for Respondent.

By the Court, TALBOT, J. (after stating the facts as above):

The appeal is from a decree directing the specific performance of an agreement to transfer 41,625 shares of the stock of the Selby Consolidated Mining and Milling Company and from an order denying a motion for a new trial. The main questions presented are whether the agreement relied upon is too indefinite to be binding, whether the evidence supports the above findings, and whether these warrant the conclusions of law and the judgment; and, in the latter connection, whether an action will lie to compel the delivery of stock instead of one for damages, if the stock has no market value by which any loss sustained by plaintiff caused by the failure to deliver to him can be adequately gaged, and whether the contract between the parties may be enforced in an action for specific performance when plaintiff's part of the agreement was for a monetary consideration and for personal services which could not be enforced, if not already performed.

It must be conceded that the clause in the agreement that "it is further understood and agreed that said W. E. Turley and Edwin Arkell will, to the best of their ability, use their best energies towards the securing of the sale of treasury stock in such company, and do all in their power to assist in advancing the interests of such company," states no time in which it is to be performed, and is not specific as to what acts were to be done by plaintiff and Arkell in securing the sale of treasury stock or in advancing the interests of the Selby Consolidated Mining and Milling Company. It does not state whether they were to work a month, a year, or as long as they lived for the advancement of these purposes, or

whether they should sell any designated number of shares, nor in what particular way they should assist in advancing the interests of the company, except by using their best energies towards securing the sale of treasury stock. When no date is specified for doing things required in a contract, it has often been held that they must be done within a reasonable time, to be determined by the circumstances. It is not probable that it was the intention of any of the parties that plaintiff and Arkell should do all in their power to advance the interests of the company and sell stock for a lifetime before they would become entitled to receive the number of shares agreed to be delivered to them. What, then, were the circumstances and conditions existing at the time the contract was made which led to its execution, or which the parties had in contemplation, from which the fulfillment of its terms and a reasonable time for its completion may be determined? Did appellants by the fulfillment of the conditions of the agreement by plaintiff and Arkell receive all the benefits which by a fair construction of the contract it may be presumed they expected to obtain under its terms? May it not be fairly inferred that by the agreement plaintiff and Arkell were to aid in every way they could towards the sale of any treasury stock then offered or intended to be sold by the company? What was necessary to be done under this agreement which would aid in fulfilling the contract which appellants had made with the Selby Consolidated Mining and Milling Company? They had undertaken to act as agents and promoters, and were to have one-third of all stock of the company when increased to 1,000,000 shares, subject to the requirement that they would raise through the sale of treasury stock or otherwise the sum of $1,500, while by a more detailed agreement dated the same day, August 21, 1906, but in fact executed some days later, they were required to raise the sum of $15,000 by the sale of stock or otherwise for the company for its use in beginning operations for the development of its mines. As the contract for the services of plaintiff and Arkell was with the appellants, and not with the corporation, the natural conclusion is that it was executed by them for the purpose of securing such assistance and having such acts per-

formed by plaintiff and Arkell as would fulfill or aid in the completion of their agreement with the company.

It is clearly shown that there were two considerations upon the part of plaintiff and Arkell for the making of the agreement, of which the appellants received the benefit: That in addition to the services to be performed the $500 was paid to, and received by, appellants as an inducement for them to make the agreement; and that if the money had not been paid they never would have executed it. This appears from their own testimony; and, although they claim the money was only a loan, their own statements do not contradict the fact that the money would not have been paid if they had not made the agreement. The negotiations of the parties and the indorsement on the back of the note to the effect that it would become due in thirty days, if the stock of the Selby Company was not increased, the fact that plaintiff and Arkell were seeking to arrange for the money only in connection with securing the agreement, show beyond doubt, and regardless of any discrepancies in the testimony, that the money, whether paid with the understanding that the note was to be canceled, if the appellants consummated their agreement and obtained their stock from the Selby Company, as testified to by respondent, or whether advanced as a loan, as claimed by appellants, was paid only in consideration of, and as part consideration for, the execution of the contract.

In *Schroeder* v. *Gemeinder*, 10 Nev. 364, this court quoted from a Maryland case: " 'Where a contract consists of several distinct and separate stipulations on one side, and a legal consideration is stated on the other, it must be considered that the entire contract was in the contemplation of the parties in each particular stipulation, and formed one of the inducements therefor, and no one stipulation can be supposed to result from or compensate for the consideration or any portion of it, exclusive of the other stipulations, unless the parties have expressly so declared.' (*Stansbury* v. *Fringer*, 11 Gill & J. Md. 152.)"

Under the rule that the date or consideration of an agreement may be explained or proved by parol, was it not proper to show that the note was given as security for money to be

repaid only in case the appellants failed in their option and agreement with the Selby Company, so that they could not fulfill their contract with plaintiff and Arkell, and that otherwise the note was to be canceled, on the same theory that a deed absolute in its terms may be shown to have been given as a mortgage? Appellants were greatly in need of the money, and testified that it was necessary to obtain it to preserve their business existence; and it may be presumed that in order to obtain funds, even as a loan, they were willing to make the contract with Turley and Arkell in providing that they should use their best energies to secure the sale of treasury stock, without specifying any time or number of shares. It is evident that the parties had in mind and intended that effort should be made to sell the amount of treasury stock offered or which would be offered by the company about that time, which was 100,000 shares. Therefore, considering that the law allowed a reasonable period for doing what they had agreed to do, may it not be said that plaintiff and Arkell performed the conditions of the agreement on their part, if they proceeded with reasonable dispatch to secure purchasers for the amount of treasury stock offered for sale? The plaintiff and Arkell proceeded promptly, and between them soon, and certainly within a reasonable time, had on the list which had been furnished them by appellants' subscribers for most of the 100,000 shares, so that notice was published in the paper that all of the treasury stock offered had been sold. It would seem that they proceeded with diligence until they secured subscriptions which would yield enough money to meet the obligation of the appellants to raise at least $15,000 for the Selby Company, in consideration of their acting as promoters and of receiving one-third of the entire capital stock of that company, as increased, and that plaintiff and Arkell, with the expectation of receiving under the agreement one-quarter of the one-third of the stock which appellants were to receive, had done more towards fulfilling appellants' agreement with the company than they had directly themselves, although they could still retain three-quarters of their stock, or three times as much as the plaintiff and Arkell together, and were receiving the greater benefit. In allowing plaintiff and Arkell to so

proceed without objection, in accepting the benefits of the sales they had made which met their own obligation to the company, in giving Arkell his stock, and in leading and allowing plaintiff to believe that his shares had been placed for him in the bank, appellants became bound, and the district court was justified in finding that plaintiff and Arkell had performed the conditions specified or required on their part in the agreement.

Rejecting as surplusage, or as too indefinite to be effective, the language in the agreement relative to the assistance of Turley and Arkell, excepting that providing that they should use their best energies towards securing the sale of treasury stock, and considering that their agreement in this respect was performed to the extent of securing subscribers for any shares contemplated to be sold at that time, and that by these sales appellants were relieved from the obligation and forfeiture of their contract with the company, it would have made little difference, if, as now claimed by appellants, plaintiff was not as successful and active in making sales as Arkell, when it does not appear that this could have resulted in any injury to appellants. It is argued that the agreement on the part of plaintiff and Arkell was joint, and that either could perform it so as to satisfy any demand of the appellants. This may be true so far as it regards the selling of any treasury stock offered by the company, especially if either obtained subscribers for all of it, which would fulfill their joint obligation, although it must be admitted that one person cannot ordinarily render the service agreed to be performed by two, when not limited to some particular act.

Where there are no express words to render joint and several the obligation undertaken by two, it is presumably a joint liability. (*Elliott* v. *Bell*, 37 W. Va. 834, 17 S. E. 399.) In *Alpaugh* v. *Wood*, 45 N. J. Eq. 153, 16 Atl. 676, 53 N. J. Law, 638, 23 Atl. 261, it was held that when a contract is made between two or more persons the general presumption arises that it is a joint and not a several obligation, and this presumption is strengthened when the promisors undertake to accomplish together a single result, that such presumption is not defeated by the fact that each is to contribute separately

to the entire result for which they bargain, and is entitled to a distinct interest in the contract, for which he would have a separate remedy.

In *German Sav. Inst.* v. *De La Vergne R. M. Co.*, 70 Fed. 146, 17 C. C. A. 34, it was said, over the citation of numerous cases, that one party cannot, while he retains the benefit of a substantial performance, totally defeat an action for the price which he has agreed to pay, or for specific performance on his part, on the ground that the plaintiff has not completed the contract. He cannot at the same time affirm the contract by retaining its benefits and rescind it by repudiating its burdens. The reason for this principle is that the retention of the benefits of a substantial performance after a default is utterly inconsistent with the position that the default has released the party who has received these benefits, so that he is not bound to perform his part of the contract.

The tenth finding, that the stock at and before the commencement of the suit had no market value, that the value thereof depended upon the operation and development of the property owned by the company, and could not be exactly shown or definitely ascertained, is not without support in the evidence. A contract had just been made for the increase of the stock; the original owners had agreed with appellants, and the latter with plaintiff and Arkell, that it should be pooled; it was not listed, and was not regularly sold on the market. The treasury shares, which were subscribed at 20 cents each largely through the special efforts of plaintiff and Arkell, and the allotment for 33,000 made later, amounted to little more than one-tenth of the whole. We do not think that sales for this limited amount of the treasury stock induced by such methods as adding to the head of the list fictitious subscriptions and donations to prominent people would fix a market value, when the other stock was in pool and withheld apparently for the purpose of preventing it from having a free market value. People often buy treasury shares in a mining company with promising property when they would not purchase the other stock, because the money they pay goes to the corporation, enhances the value of the stock purchased, and may enable the company to find valuable ore.

The eleventh finding, that by reason of the performance by plaintiff and Arkell of their part of the contract the means were obtained by which the Selby Company was enabled to work and develop the mines and render the stock valuable, was unnecessary to sustain the judgment, but appears to be amply proven. Following the rule that it is peculiarly within the province of the trial court to determine controverted questions of fact, and that this court will not interfere with such determination where there is substantial conflict in the evidence, it has not been necessary to review or consider at length the contradictory testimony with which the record abounds. It is sufficient to say that there is enough evidence on behalf of the plaintiff to support the findings attacked. In the course of a carefully prepared decision the district court said:

"The question has been discussed at length in the briefs of the respective parties as to whether a contract for the sale or delivery of personal property consisting of stock can be enforced by specific performance; and many authorities have been cited on the subject.

"Waterman on Specific Performance of Contracts, sec. 19, on the question of where the contract is for the sale of stock, states as follows: 'A contract for the sale of stock which can be obtained in the market will not in general be specifically enforced, the buyer or seller having a sufficient remedy at law in the market price of such stock.'

\*     \*     \*     \*     \*     \*     \*     \*

"From the authorities referred to, and other authorities which I have examined, there seems to be no question but what the jurisdiction of the court to decree specific performance in reference to real or personal property depends upon whether or not the party seeking equitable relief cannot be fully compensated by an award of damages at law. And it further appears from the authorities that the general rule is that a specific performance will not be enforced of an agreement for the transfer of stock, on the principle that damages are a sufficient satisfaction; but that this rule applies more particularly to public stocks such as are commonly bought and sold in the market, and does not apply to stocks where

the shares are limited in number and cannot always be had in the market.

"In the case of *Duff* v. *Fisher*, 15 Cal. 375, the court says that: 'The jurisdiction of a court of equity to decree specific performance does not turn at all upon the question whether the contract relates to real or personal property, but altogether upon the question whether the breach complained of can be adequately compensated in damages. If it can, the plaintiff's remedy is at law only; if not, he may go into a court of equity, which will grant full redress by compelling specific performance upon the part of the defendant.'

"From the authorities where the question of specific performance of an agreement for the sale of mining stock was under consideration by the courts, it appears to have been held that owing to the fluctuating and uncertain value of mining stocks it was often difficult to substantiate by competent evidence the market value thereof, and, owing to the risk of personal responsibility of individuals and corporations, that the courts should be liberal in extending full, adequate, and complete relief by decree of specific performance; the courts holding that there is a wide distinction between the shares of stock of a mining company, and public stocks which have been placed for sale upon stock boards and are a subject of everyday sale in the financial markets of the country.

"Upon examination of the complaint, I am convinced that the complaint states sufficient facts to bring the case within the exception to the general rule as to stocks, which, if proven, would entitle the plaintiff to a decree of specific performance for the sale of mining stock, under the doctrine stated by the authorities.

"It is said by counsel for defense that the said contract cannot be enforced on the grounds of lack of mutuality.

"Upon an examination of the contract, it appears that the services which were to be performed by the plaintiff and Arkell are uncertain in their character.

"Reading from the contract in regard to the services to be performed, it is stated as follows: 'It is further understood and agreed that said W. E. Turley and Edwin Arkell will to the best of their ability use their best energies toward the

securing of the sale of the treasury stock in said company, and do all in their power to assist in advancing the interests of such company.'

"From this language, it cannot be ascertained the amount or particular character of the services to be rendered, nor the time in which they were to be rendered.

"From the authorities which I have examined in reference to the mutuality of contracts, I am satisfied that the conditions in said contract in reference to the services to be performed could not be enforced by a decree of specific performance. But has not the plaintiff, under the testimony in this case, performed services, and have not those services been accepted as complete by the defendants in accepting the services of the said Arkell and delivering to him the amount of stock as provided in the contract?

"The services to be rendered were not separate or distinct services to be performed by plaintiff and Arkell, but were to be the joint efforts of those parties. And have not the defendants, by accepting the services of Arkell and settling with him, also accepted the services of the plaintiff, and construed the contract as to what services were to be performed?"

Aside from any question of procedure, or as to whether a different rule might prevail in an action for specific performance, which, like other equitable ones, is designed to grant relief when there is no adequate remedy at law, and an application for a writ of *mandamus*, which is a statutory proceeding to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station, available when there is no other sufficient remedy, the the facts in this case are readily distinguishable from the cases in which this court held that *mandamus* would not lie to compel the delivery of stock, because there it was not shown that the aggrieved party could not be amply compensated in an action for damages for the value of the stock. (*State* v. *Guerrero*, 12 Nev. 106; *State* v. *Jumbo Extension M. Co.*, 30 Nev. 192.)

As indicated by the text and citations at 10 Cyc. 605, many modern decisions hold that equity will under proper conditions compel a corporation to transfer on its books shares to the owner of the equitable title.

In a note in 12 L. R. A., at page 776, it is stated that, where monetary damages can afford no adequate compensation, equity will enforce performance of the contract for the transfer of corporate stock; and in the note reviewing many cases in 50 L. R. A., at pages 501 and 503 and following, it is said: "The general rule in this country is that a contract for the sale of corporate stock will not be specifically enforced, where the stock can be purchased on the market and its value can be readily ascertained, unless there is some special reason for the purchaser's obtaining the same; but where the shares are limited and not easily obtainable, or where their value cannot be readily ascertained, the contract will be enforced. The tendency seems to be towards a more liberal allowance of the remedy. In England it seems to be allowed almost as a matter of course, except in case of government stocks, in which case it has generally been refused."

In the case of *Eckstein* v. *Downing*, 64 N. H. 248, 9 Atl. 626, 10 Am. St. Rep. 404, it was stated: "The general rule in regard to contracts for the sale of stocks may be stated to be that specific performance will not be decreed, because such contracts are capable of exact compensation in damages. (2 Story, Eq. Jur. 724.) This rule is especially true of contracts for the sale of government stocks, or bonds, which are always readily purchasable at their market value. Specific performance of contracts for the sale of stocks in purely private corporations, such as banking, mining, manufacturing and commercial companies, has sometimes been decreed upon the ground that damages at law do not furnish an adequate remedy for the breach. In *Cushman* v. *Thayer Manufacturing Company*, 76 N. Y. 368, 32 Am. Rep, 315, stress was put upon the fact that the controlling motive of the purchaser may have been that the real worth of the stock may consist in the prospective rise which he anticipates might follow, or that his desire was to hold the stock as a permanent investment. * * * Specific performance of contracts in regard to personal property is decreed only where the vendor stands in need of the specific relief which a court of equity only can give. (*Kauffman's Appeal*, 55 Pa. 383; *City of Memphis* v. *Brown*, 20 Wall. 289, 22 L. Ed. 264.) Indeed, in this respect

there is no distinction between real estate and personal estate. (2 Story Eq. Jur. 717.) Hence it is a well-established rule that relief by a decree for specific performance of a contract is not a matter of right in either party, but rests in the discretion of the court. (*Pickering* v. *Pickering*, 38 N. H. 400; *Eastman* v. *Plumer*, 46 N. H. 464; *Willard* v. *Tayloe*, 8 Wall. 557, 19 L. Ed. 501.) The discretion to be exercised, however, is not of an arbitrary character, but, in the language of Story, 'that sound and reasonable discretion which governs itself so far as it may by general rules and principles, and at the same time grants or withholds relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties. On this account it is not possible to lay down rules or principles which are of absolute obligation and authority in all cases.' (2 Story, Eq. Jur. 742.)"

In *Northern Trust Co.* v. *Markell*, 61 Minn. 271, 63 N. W. 735, it is said: "As a general rule, the specific performance of contracts relating to chattels will be denied, because the law affords adequate and complete redress in an action for damages. There are exceptions to this rule, of course. For instance, whenever the loss by reason of a violation of the contract cannot be correctly estimated in damages, or whenever, from the nature of the contract, a specific performance is indispensable to justice, a court of equity will not be deterred from interfering because the contract relates to personal property. And it has been held that specific performance may be decreed where the shares are limited, having no fixed marketable value, are not quoted in the commercial reports, nor selling upon the market, because, it was said, a judgment for damages at law might not afford adequate relief."

Again, in a decision rendered last year, *Hills* v. *McMunn*, 232 Ill. 488, 83 N. E. 963, it is stated: "It is also contended that the case made by the bill and proofs shows no grounds for the interposition of a court of equity, and that if appellant has any remedy the law will afford adequate relief. The stock of the United States Steel Piling Company is not shown to have had any market value or to have ever been on the

market for sale. Whatever value it has is dependent upon the value of the patent owned by the corporation. It is said in Cook on Corporations, 338: 'If the stock contracted to be sold is easily obtained in the market and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered, a court of equity will decree a specific performance and compel the vendor to deliver the stock.' We think the case one for the exercise of equitable jurisdiction, and that the court erred in dismissing the bill."

In a late Oregon case, *Deitz* v. *Stephenson*, 95 Pac. 803, it was said: "That a contract for the sale of shares of private corporation may, under certain circumstances, be the subject of equitable jurisdiction for its specific performance, is well established. This occurs where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered. * * *"

In New York it was held that a court of equity had jurisdiction to decree the specific performance of a contract concerning chattel property, and that it was proper to do so where the plaintiff's case is good and the remedy at law is inadequate, or its enforcement attended with doubt or difficulty. (*Johnson* v. *Brooks*, 93 N. Y. 339.)

The Supreme Court of Missouri decided in 1907 that the specific performance of a contract to deliver corporate stock will lie where its pecuniary value is not probable, and in consequence one may not have adequate damages at law. (*Baumhoff* v. *St. Louis Co.*, 205 Mo. 248, 104 S. W. 5, 120 Am. St. Rep. 745.)

In *White* v. *Schuyler*, 31 How. Prac. 38, it is held that an agreement for the delivery of stock will be specifically enforced where it is of uncertain value and sales infrequent, and it is difficult, if not impossible, to do justice by awarding damages.

In *Manton* v. *Ray*, 18 R. I. 672, 29 Atl. 998, 49 Am. St. Rep. 811, the court enforced a contract for the purchase of stock where its value was uncertain and not easily ascertainable.

Bargains for the transfer of stock have been enforced in numerous cases in England. The court required a contract for the sale of government stock to be executed (*Doloret* v. *Rothschild*, 1 Sim. & S. 590), and an agreement for the transfer of railway shares was enforced in *Duncuft* v. *Albrecht*, 12 Sim. 189, 199. The chancellor distinguished between 3 per cents or other stock, which could always be had on the market, and railway shares of a particular description which were limited in number and could not always be found on the market.

In *Frue* v. *Houghton*, 6 Colo. 318, it was held that the well-settled authority of courts to decree specific performance of agreements does not depend upon any distinction between real and personal estate, but the ground of jurisdiction is that the party seeking equitable relief cannot be fully compensated by an award of damages, and that an agreement to transfer stock in a mining company, where the shares are limited and have no fixed or marketable value and are not quoted in the commercial reports nor selling upon the stock boards, may be enforced.

Other cases supporting the principle enunciated are: *Goodwin Gas Stove Company's Appeal*, 117 Pa. 514, 12 Atl. 736, 2 Am. St. Rep. 696; *Krohn* v. *Williamson*, 62 Fed. 869, affirmed in 66 Fed. 655, 13 C. C. A. 668; *Treasurer* v. *Commercial Coal M. Co.* 23 Cal. 390; 3 Parsons on Contracts (9th ed.) pp. 369, 370; *Selover* v. *Isle H. L. Co.*, 91 Minn. 451, 98 N. W. 344.

In *Ames* v. *Whitbeck*, 179 Ill. 458, 53 N. E. 969, it was held that a contract by a corporation to transfer its stock in consideration of services to be performed by the vendee would be specifically enforced where the corporation is insolvent.

In the note in 50 L. R. A. (p. 504) it is said that the insolvency of the vendor is a good ground for holding the remedy at law inadequate. (*Draper* v. *Stone*, 71 Me. 175.)

Appellants earnestly contend that as the agreement was not enforceable against the plaintiff at the time it was made, because the courts will not compel a specific performance of

services agreed to be rendered, it is not now binding upon appellants, as it was lacking in mutuality at its inception so far as the remedy is concerned, and therefore is not specifically enforceable by the parties on either side. They say that, as the contract was wanting in mutuality both as to the obligation and the remedy, it could not have been enforced against the plaintiff by the defendants. Over the citation of a number of cases, they quote: " 'The rule is fundamental that a contract will not be specifically enforced, unless it is obligatory on both parties, nor unless both parties, at the time it is executed, have the right to resort to equity for its specific performance.' "

It would seem that some of the courts, instead of looking carefully for the reason for any such alleged rule, have sometimes used expressions into which they may have been led by the loose or somewhat indefinite language in the following section 286 (3d ed. sec. 216) of Fry on Specific Performance: "A contract, to be specifically enforced by the court, must be mutual; that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity, the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the other, though its execution in the latter way might itself be free from the difficulty attending its execution in the former."

On the other hand, there are so many cases in which the courts have taken an opposite view or have failed to follow this assorted rule, that in relation to several classes of actions it may be deemed an exception rather than a rule. As held by different decisions, it is not justly applicable to a case like the present one, where the contract has been executed on the part of the plaintiff. Fry wrote his text-book in England over sixty years ago, and neither the section quoted nor the cases added in the foot-note by the editor would indicate that he had reference to shares in private corporations, in regard to which the law has grown up mostly in this country since that time.

There is no good reason appearing for requiring that the contract be specifically enforceable from its inception by both parties to enable it to be enforced by either, and if there is an agreement by one of the parties to do something which could not be compelled in an action for specific performance, but he has, in fact, completed his part of the contract, leaving only unperformed the promises of the opposing party to do the act which equity would require to be done, if the enforceability of the agreement had been mutual from the beginning, then the delinquent ought to be compelled to perform his part.

The plaintiff's right to recover ought to depend upon the equities in his favor at the time of the breach of the agreement or of commencement of suit, rather than upon some verbal distinction relating to the terms of the contract as originally drawn. If one has actually received a valid consideration for his agreement to convey stock, it would seem that in justice the other party should be allowed to enforce the transfer to him when he cannot be adequately compensated in damages, as readily whether that consideration was services performed, or money paid, or an agreement to convey real or personal property, which also would have been specifically enforceable under the terms of the agreement. Certainly, if one of the parties has fulfilled his part of the contract by the payment of money or the rendition of services, he should be as much entitled to relief as if he had conveyed or tendered property.

Over cases cited in the foot-note it is said, at page 234 of Pomeroy on Contracts: "The mutuality of the equitable remedy, on the other hand, does not belong to the essence of the contract. An agreement may be perfect in its obligation upon both the parties, and yet be of such a nature that one of them only could be compelled, by a decree of the court, to specifically perform. As the absence of this kind of mutuality does not render the agreement any less obligatory, it would seem on principle that if the quality, originally lacking, should be subsequently supplied, in any practical manner, before the commencement of the suit, or even, perhaps, before the hearing, the objection would then be removed, and a specific enforcement would be thus made possible. For

example, if the party who had undertaken to do acts, the performance of which could not be specifically compelled—such as the rendering of personal services—should fully perform all that he had agreed to do, and should then seek to enforce a specific execution of the contract by the other, it would seem, on principle, that all obstacle to granting the relief would have been removed. * * * To the doctrine of mutuality as stated and discussed in the foregoing paragraphs, there are limitations and exceptions of great importance, which very much narrow its application. * * *"

In *King* v. *Gildersleeve*, 79 Cal. 510, 21 Pac. 963, it was held that "the rule is not applicable where the personal services have been fully or substantially performed, or where full performance has been waived. (*Ballard* v. *Carr*, 48 Cal. 79; *Howard* v. *Throckmorton*, 48 Cal. 489.)"

. The same court used statements apparently contradictory in *Cooper* v. *Pena*, 21 Cal. 411, but the case may be distinguished in regard to the facts; for in the earlier one the services had not been performed, and it was held that the court could not compel their performance by the plaintiff. There is more conflict in the language used in the varying opinions than in the result of the decisions, where they bear upon similar facts.

In *Oswald* v. *Nehls*, 233 Ill. 445, 84 N. E. 622, it is stated that: "It is next insisted by appellants that the contract in question is wanting in mutuality, and for that reason a specific performance should be denied. This contention cannot be sustained. The general rule is that, before specific performance of a contract will be decreed, it must appear that there was mutuality, both in the obligation and the remedy, under the contract, as long as the contract remains executory on both sides. (Waterman on Specif. Per. 196; Page on Contracts, 1621; *Lancaster* v. *Roberts*, 144 Ill. 213, 33 N. E. 27; *Welty* v. *Jacobs*, 171 Ill. 624, 49 N. E. 723, 40 L. R. A. 98; *Bauer* v. *Lumaghi Coal Co.*, 209 Ill. 316, 70 N. E. 634.) But this rule has no application to contracts in which the provisions which could not be enforced specifically have been fully performed. Contracts for personal care and attention or personal services cannot usually be enforced. However, when personal care and attention or personal services have been

fully performed, and the circumstances are such that to deny specific performance would leave the party with the injury that could not be adequately compensated in damages, equity will grant a specific performance of the remaining provisions of the contract. (Page on Contracts, 1623, and cases therein cited.)"

In *Mississippi G. Co.* v. *Franzen*, 143 Fed. 507, 74 C. C. A. 135, the court held that the doctrine of non-enforceability in equity of a contract for lack of mutuality had no application to an executed contract, and cited *Green* v. *Richards*, 23 N. J. Eq. 35; *Hulse* v. *Bonsack M. Co.*, 65 Fed. 864, 13 C. C. A. 180; *Grove* v. *Hodge*, 55 Pa. 516. The same doctrine was upheld in *Railway Co.* v. *Cox*, 76 Iowa, 306, 41 N. W. 24, 14 Am. St. Rep. 216.

We agree with the following views of the Supreme Court of Kansas as expressed in *Water-Supply Co.* v. *Root*, 56 Kan. 197, 42 Pac. 719: "It is claimed that such contracts only as might, at the time they were entered into, have been enforced specifically by either party against the other, can be specifically enforced after performance by one party. It is argued that this was a contract for the services of Root & Campbell, as attorneys; * * * that in the very nature of things the contract could not be specifically enforced against them; that, inasmuch as Felitz and wife could never have had a decree compelling Root & Campbell to perform their part of the contract, there was a lack of mutuality, and consequently no specific performance can be decreed in favor of the other party. We recognize the soundness of this contention to the extent that a decree requiring specific performance by the attorneys could not, consistently with established principles, be made, or properly enforced, if made. The doctrine that there must be mutuality in the contract, and that it must be capable of enforcement at the suit of either party at the time it was entered into, so broadly contended for by counsel for the plaintiff in error, and stated in equally broad terms in Fry on Specific Performance, 443, is subject to so many exceptions and such important qualifications that it is doubtful whether a court would ever be warranted in declaring the law so broadly. There are many con-

tracts, originally unilateral, capable of enforcement, when
accepted. * * * For a discussion of the limitations upon
the doctrine of mutuality, see Pomeroy on the Specific
Performance of Contracts, 167, *et seq.* Upon reason, we
are wholly unable to perceive any valid ground for saying
that a contract to convey lands, in consideration of personal
services thereafter to be performed, is less binding and less
capable of specific performance after the services are in fact
rendered than a contract for the conveyance of land in con-
sideration of the payment of money. Personal services actu-
ally rendered are as good a consideration as money paid, and
where the party seeking enforcement of the contract is no
longer in a position to escape any part of his obligation, hav-
ing fully performed it, any want of mutuality which may have
attended the contract when entered into has passed away, and
the power of the court is ample to conveyance. The equity
of the person who has done all he agreed to do is as complete
and full as it could possibly be in any case. This view is
supported by sufficient authority, as well as by reason. In
the case of *Howard* v. *Throckmorton*, 48 Cal. 482, it was held
that 'although, when an attorney contracts to perform legal
services for a client in consideration of receiving a portion of
the property about which the litigation is to be carried on, he
cannot maintain an action for specific performance while the
contract remains unperformed on his part, yet, if he can show
a substantial performance on his part, he is as fully entitled
to maintain such action as he would be if the agreement on
his part had been for the payment of money.' See, also,
*Ballard* v. *Carr*, 48 Cal. 74; *King* v. *Gildersleeve*, 79 Cal. 504,
21 Pac. 961; *Schroeder* v. *Gemeinder*, 10 Nev. 355; *Perkins* v.
*Hadsell*, 50 Ill. 216."

In *Welch* v. *Whelpley*, 62 Mich. 15, 28 N. W. 744, 4 Am. St.
Rep. 810, a parol contract by which a father agreed to give
eighty acres of land near his residence to his daughter and
son-in-law and to help them improve the same, in considera-
tion of their making their home there, was enforced in equity,
and it was held that, although the agreement was somewhat
vague as to the time the residence on the land was to con-
tinue and the extent of the improvements to be made, and,

if unperformed, difficult of adjustment, it was not altogether indefinite, and must be considered in the light of ordinary conduct; that it did not require residence for life or for any fixed period, if they made their home on the place for the time, at least, without contemplating changing; that the contract was substantially performed when they in good faith fixed their home on the land; that, the legal remedy being inadequate, a conveyance would be enforced; that the objection of want of mutuality would not avail, if the part of the contract difficult of enforcement had been performed.

In *Allen* v. *Cerro Gordo County*, 40 Iowa, 349, a conveyance was compelled of an interest in swamp lands which the plaintiff had secured from the government for the county in pursuance of a contingent agreement with the supervisors, and it was held that, after accepting the benefit of his services in obtaining the land, the plea that he had made misrepresentations as to his ability to perform them would not avail in a defense in an action for specific performance of the contract for payment of the services after they had been rendered.

Chief Justice Hawley, speaking for the court in *Schroeder* v. *Gemeinder*, 10 Nev. 363, said: "It is next insisted that a court of equity should not decree a specific performance, because the obligation of the parties is not mutual, and several authorities have been cited to the effect that, when the contract is of such a nature that it cannot be specifically enforced as to one of the parties, equity will not enforce it against the other. The case of *Parkhurst* v. *Van Cortland* was reversed on appeal in the court of errors. (14 Johns. 15, 7 Am. Dec. 427.) * * * There are many exceptions to the general rule stated in said case, and, without attempting to review the authorities relied upon by respondent, we think it may now be considered as well settled by all or nearly all the modern authorities that a court of equity, in actions for specific performance of optional contracts and covenants to lease or convey lands, will enforce the covenant. * * *"

Among the large number of cases cited in the elaborate briefs of the appellants many would be applicable, if plaintiff and Arkell had not performed their part of the contract, as appellants contend, for the acts required of them were of such

a nature that they could not be enforced, and while they remained unperformed the court could not compel performance by appellants; but under the view which we have taken, that it was within the province of the district court under the conflicting evidence to find that the plaintiff and Arkell had fulfilled their part of the agreement, and that the stock had no market or ascertainable value from which the damage sustained by plaintiff could be adequately determined, it was proper to make the decree requiring appellants to transfer the stock to plaintiff as they had agreed.

In the minor specifications of error we do not find anything prejudicial to appellants. It is claimed that, under plaintiff's theory that the $500 note was not to be paid if the appellants completed their agreement with the Selby Company so they would obtain and furnish to plaintiff and Arkell their portion of the stock, it was necessary for the plaintiff to surrender the note for cancelation. No such exception was taken in the lower court, and, there being no specification in this regard, the question is not one to be seriously considered on appeal. Under the plaintiff's testimony that the note was not to be paid, if the appellants fulfilled their agreement with the Selby Company and with plaintiff and Arkell, it could not be collected against appellants, even in the hands of an innocent assignee, because it is long past due. The note was in fact filed during the trial, and is in the record before us, with the indorsement of the clerk and the judge, and, if its cancelation were desired, an order canceling it should have been demanded.

In *Schroeder* v. *Gemeinder*, 10 Nev. 368, it was said: "Perhaps the respondent might have objected against proceeding with the trial until the money was paid into court. No preliminary objections, however, were made, and this objection cannot now be urged against the power of the court to order a decree. Courts of equity ought to determine the rights of the parties according to the broad principles of justice and fair dealing, and not by the technical and refined distinctions of the law. A decree should not be granted if there has been gross laches or neglect upon the part of those seeking the enforcement of the covenant. But the facts of this case do

not justify the refusal of the decree because the money was not brought into court."

The rulings of the court appertaining to the introduction of evidence, to which objections not always specific were taken, do not appear to have resulted in any injury to appellants, especially so, as the case was tried without a jury.

If the question asked Thomas on cross-examination as to the number of shares he still held was not strictly within the scope of his direct examination, it appeared without this testimony that he previously had more than enough to enable him to transfer to plaintiff the number due him, and without further showing the presumption arose that he continued to hold them. The same conclusion and result would have been reached whether he was allowed to answer the question or not.

Nor is the objection that the action was premature because the stock was in pool well founded. The decree enjoins the custodian of the pooled stock and the company from delivering to appellants the shares to which plaintiff is entitled, and directs that they be transferred to him. The time during which the pool was to run has now expired, although they repudiated the contract, and suit was brought during the period of the pool. Appellants cannot be injured by the delivery of the stock to plaintiff after that period, as will occur by enforcing the decree at this time without any modification.

As respondent prevails for other reasons, it will not be necessary to consider the point presented by the supplemental brief in which it is urged that appellants were trustees as to respondents' part of the stock.

The judgment is affirmed.